IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:23-CV-56-D

|  |  |  |
|---|---|---|
| MARY MOORE and GARY THOMAS, JR., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| SHERIFF JOHNNY BARNES, et al., | ) ) | |
| Defendants. | ) | |

On September 21, 2023, Mary Moore ("Moore" or "Plaintiff Moore") and Gary Thomas Jr. ("Thomas" or "Plaintiff Thomas"), (collectively "plaintiffs") filed a complaint against Sheriff Johnny Barnes ("Barnes" or "Defendant Barnes"), Jeffrey Aaron Edwards ("Edwards" or "Defendant Edwards"), Brian Mizelle ("Mizelle" or "Defendant Mizelle"), the Town of Plymouth ("Plymouth"), Chief Willie Williams ("Williams"), Kevin Phelps ("Phelps" or "Defendant Phelps"), and Ryan White ("White" or "Defendant White"). See [D.E. 1] 1. The claims arise out of a March 2, 2022 traffic stop on US Highway 64 and the events that took place during Thomas's transport to the Washington County Courthouse ("WCC") jail. See id. at ¶¶ 68–135.

On December 9, 2024, Plymouth, Williams, Phelps, and White moved for summary judgment [D.E. 64]. On that same day, they filed their statement of material facts [D.E. 65], appendix [D.E. 66], and memorandum in support [D.E. 67]. On December 16, 2024, Barnes and Mizelle moved for summary judgment [D.E. 69], as did Edwards [D.E. 72]. That same day, these defendants also filed their statements of material facts [D.E. 81, 73], appendices [D.E. 70, 74], and

memorandums in support [D.E. 82, 79]. In addition, on December 16, 2024, plaintiffs filed a motion in limine to exclude the expert testimony of Albert Vangura [D.E. 80].

On December 30, 2024, plaintiffs responded in opposition to the motion for summary judgment of Plymouth, Williams, Phelps, and White [D.E. 85]. On that same day, plaintiffs also filed their statement of material facts [D.E. 86] and appendix [D.E. 87]. On January 13, 2025, Plymouth, Williams, Phelps, and White replied [D.E. 92].

On January 20, 2025, plaintiffs responded in opposition to the summary judgment motions of Barnes, Mizelle [D.E. 93], and Edwards [D.E. 97]. That same day, plaintiffs also filed a statement of material fact [D.E. 94] and appendix [D.E. 95] in response to Barnes and Mizelle. On January 21, 2025, plaintiffs filed their statement of material fact in response to Edwards [D.E. 100], and on January 22, 2025, they filed their appendix [D.E. 105].

On February 5, 2025, Barnes, Mizelle [D.E. 111], and Edwards [D.E. 112] responded in opposition to the motion in limine. On February 17, 2025, Barnes, Mizelle [D.E. 115], and Edwards [D.E. 116] replied to plaintiffs' response in opposition to summary judgment. On February 19, 2025, plaintiffs replied to the responses in opposition to the motion in limine of Barnes, Mizelle [D.E. 117], and Edwards [D.E. 118]. On February 28, 2025, plaintiffs moved for leave to file a surreply in response to Edwards's reply to the response in opposition of summary judgment [D.E. 119].

As explained below, the court grants plaintiffs' motion in limine [D.E. 80], grants summary judgment for Barnes and Mizelle [D.E. 69], grants summary judgment for Plymouth, Williams, Phelps, and White [D.E. 64], grants in part and denies in part Defendant Edwards's motion for summary judgment [D.E. 72], and denies plaintiffs' motion for leave to file a surreply [D.E. 119].

2

I.

On March 2, 2022, Deputy Jeffrey Aaron Edwards, a patrol officer, was on duty with the Washington County Sherriff's Office ("WCSO"). See Def. Edwards's Statement of Material Fact ("DESMF") [D.E. 73] ¶ 1; Pl.'s Statement of Material Fact for Edwards ("PSMFE") [D.E. 100] ¶ 1. At approximately 3:45 a.m., Edwards was parked at a stop sign in Washington County, near the border of Martin County, when he observed a silver Nissan Sentra ("Nissan") pass him at what he believed to be a high rate of speed. Compare DESMF ¶ 2 and Def. Barnes's/Mizelle's Statement of Material Fact ("DBMSMF") [D.E. 81] ¶ 45, with PSMFE ¶ 2 and Pl.'s Statement of Material Fact for Barnes/Mizelle ("PSMFBM") [D.E. 94] ¶ 45; see also DESMF ¶ 3; PSMFE ¶ 3. Thomas was driving the Nissan. See DESMF ¶ 8; PSMFE ¶ 8. Edwards pulled onto US Highway 64 and followed Thomas. See DESMF ¶¶ 3–4; PSMFE ¶¶ 3–4. When Edwards caught up to Thomas, he had traveled about four miles. He then paced the Nissan and determined that it was traveling faster than 100 miles per hour in a 50-mile per hour zone. See DESMF ¶ 5; PSMFE ¶ 5; DBMSMF ¶ 46; PSMFBM ¶ 46; see also [DE 74-1] 200. Thomas testified that he did not believe he was speeding, but he did not know the speed limit or how fast he was driving. See DESMF ¶ 7; PSMFE ¶ 7. Edwards activated his lights, and Thomas pulled to the side of the road in a dark, unlit area. See DESMF ¶ 15; PSMFE ¶ 15.

Edwards turned on his body worn camera and approached the vehicle on the driver's side. See DESMF ¶¶ 9–10; PSMFE ¶¶ 9–10. Thomas rolled down the window completely, and Edwards smelled what he believed to be "a strong odor of marijuana." See Edwards Body Worn Camera ("EBWC") [D.E. 105-2] 00:00:30. Compare DESMF ¶ 10 and DBMSMF ¶ 48, with PSMFE ¶ 10 and DBMSMF ¶ 48. Edwards told Thomas he was going "pretty fast" and asked Thomas for his license. See DESMF ¶ 12; PSMFE ¶ 12. Thomas patted his pockets and said he had a license, but

3

it was not on him. See DESMF ¶¶ 12–13; PSMFE ¶¶ 12–13. In fact, Thomas's license was suspended. See DESMF ¶¶ 12–13; PSMFE ¶¶ 12–13.

Edwards told Thomas to exit the vehicle. Edwards placed Thomas in handcuffs and walked Thomas to his patrol car. See DESMF ¶ 18; PSMFE ¶ 18. Edwards told Thomas multiple times that he was being detained because he was going over 100 miles per hour, smelled like weed, and lied about his license. See DESMF ¶¶ 19–22; EBWC 00:01:30–00:01:47, 00:02:25, 00:02:40–00:02:47. Edwards secured Thomas in the car and returned to Thomas's vehicle to speak with the female passenger, Caressil Goddard ("Goddard"). See DESMF ¶ 26; PSMFE ¶ 26. Edwards asked Goddard to step out of the vehicle, and she did. See EBWC 00:04:10; DBMSMF ¶ 50; PSMFBM ¶ 50. The parties dispute whether Goddard told Edwards there was marijuana under the front seat, but based on the video evidence, after Edwards asked where the marijuana was located, Goddard told Edwards that "it" was under "his seat" before Edwards asked how much. Compare DESMF ¶ 26, with PSMFE ¶ 26. See EBWC 00:05:08–00:05:17. Edwards searched the vehicle and reportedly found 1.22 ounces of alleged marijuana packaged in three separate bags, cigar papers, and a partially smoked blunt under the driver's seat. See DESMF ¶ 27. Edwards placed the items inside an evidence bag. See DESMF ¶ 29; PSMFE ¶ 29. Edwards then sat down in the patrol car and ran Thomas's name and date of birth. See DESMF ¶ 30; PSMFE ¶ 30. Edwards discovered Thomas's license was suspended and that Thomas had a criminal history, including multiple charges for assault, narcotics, and resisting. See DESMF ¶¶ 31–32; PSMFE ¶¶ 31–32. Edwards then told Thomas he was under arrest for driving with a suspended license and possessing marijuana. See DESMF ¶ 35; PSMFE ¶ 35.

Edwards transported Thomas to the WCC. See DESMF ¶ 37; PSMFE ¶ 37. While en route, Thomas called his mother, Francis Gilliam ("Gilliam"). Thomas asked Gilliam to bail him

4

out, and it is disputed whether he told her that he had "a little bit of marijuana on him." See DESMF ¶ 41; PSMFE ¶ 41. Compare DESMF ¶ 43, with PSMFE ¶ 43. Gilliam called Thomas's maternal aunt, Plaintiff Moore, who agreed to ride with Gilliam to the courthouse and post Thomas's bond. See DESMF ¶ 44; PSMFE ¶ 44. Gilliam and Moore then called Goddard, the Nissan passenger, and told her Thomas was headed to WCC so Goddard could meet them there. See DESMF ¶ 47; PSMFE ¶ 47.

Once Edwards and Thomas arrived at WCC, Edwards parked and began filling out paperwork while Thomas complained about the handcuffs rubbing his wrists. See DESMF ¶¶ 49–50; PSMFE ¶¶ 49–50; DMBSMF ¶ 58; PSMFBM ¶ 58. Defendant Mizelle, a new WCSO deputy, heard Edwards had arrested Thomas and headed to WCC to observe the arrest process. See DESMF ¶ 51; PSMFE ¶ 51. Once Mizelle arrived, Edwards exited the vehicle and handed Mizelle an evidence bag. See DESMF ¶ 53; PSMFE ¶ 53; DMBSMF ¶ 60; PSMFBM ¶ 60. Edwards opened the rear door of the vehicle and asked Thomas to exit. See DESMF ¶ 55; PSMFE ¶ 55; DMBSMF ¶ 61; PSMFBM ¶ 61. Thomas did not exit, and stated, "Don't grab me . . . tell me where I'm going." See DESMF ¶ 56; PSMFE ¶ 56. Thomas claims he was afraid to exit the vehicle, but he also testified that he refused to exit because he was not getting "enough respect" and was "trying to stall." Compare DESMF ¶¶ 61–63, with PSMFE ¶¶ 61–63. After approximately 50 seconds of waiting for Thomas to exit, Edwards grasped Thomas's wrists, pulled him from the car, and stood him against the car's side panel. Compare DESMF ¶¶ 58, 65, 67 and DBMSMF ¶ 64, with PSMFE ¶¶ 58, 65, 67 and PSMFBM ¶ 64. Edwards started searching Thomas. From the video, it is unclear whether Thomas resisted Edwards's search. See Mizelle's Body Worn Camera ("MBWC") [D.E. 105-3] 00:01:31–00:02:28. Thomas admitted, however, that he was "squeezing his leg towards the car" in an effort to prevent Edwards from confiscating

5

his phone and money. See DESMF ¶ 76. Edwards removed a vape pen, $1,100 in cash, and Thomas's phone. See id. at ¶ 72. After Edwards confiscated Thomas's phone, Edwards pushed Thomas into the side of the car, tripped his leg, and brought him down to the asphalt. See MBWC 00:02:22–00:02:30. The parties dispute whether Thomas "stiffened" or "tried to turn into Edwards" before Edwards performed this leg sweep. Compare DESMF ¶ 75 and DMBSMF ¶ 65, with PSMFE ¶ 75 and PSMFBM ¶ 65. But Edwards testified that he believed Thomas was positioning himself to either physically resist or assault Edwards. See DESMF ¶ 77; [D.E. 70-18] ¶ 59. Once on the ground, Edwards and Mizelle turned Thomas to the prone position. See DBMSMF ¶ 71; PSMFBM ¶ 71.

At this time, Gilliam and Moore arrived at WCC followed by Goddard. Edwards approached Moore and told her to stay where she was, or he would take her to jail too. See EBWC 00:39:09–00:39:13; DESMF ¶ 88. As Edwards addressed Moore, Mizelle held Thomas on the ground while Thomas "aggressively resisted." See DESMF ¶ 90; PSMFE ¶ 90. Edwards walked back to Mizelle and the two lifted Thomas to his feet and walked him a short distance. See MBWC 00:02:48–00:02:53. Gilliam and Moore approached Edwards and Mizelle, yelling at them to get off Thomas. Compare DMBSMF ¶ 69, with PSMFBM ¶ 69. See MBWC 00:02:55–00:03:22. As they approached, Mizelle released Thomas, and he fell on the ground. See MBWC 00:02:50–00:02:53; DMBSMF ¶ 86; PSMFBM ¶ 86. Mizelle told Gilliam and Moore to "stay back." See MBWC 00:02:54–00:02:54. Gilliam told Edwards and Mizelle to take Thomas upstairs to the jail without force. See DESMF ¶ 83; PSMFE ¶ 83; MBWC 00:03:15–00:03:22. As Gilliam expressed this to the officers, Edwards attempted to pick Thomas up two times. See MBWC 00:03:02–00:03:05, 00:03:20–00:03:24. Each time, Thomas fell back onto the ground. See id. The parties dispute whether Thomas was "pulling dead weight" to resist Edwards or the officers dropped him.

6

See DMBSMF ¶¶ 82, 84, 89, 94; PSMFBM ¶¶ 82, 84, 89, 94. Thomas claims he was not resisting, but "bracing himself." See DESMF ¶ 96; PSMFE ¶ 96. Edwards then grabbed Thomas's sweatshirt and right arm and dragged Thomas across the asphalt and toward the courthouse steps. See MBWC 00:03:24–00:03:26.

As Edwards dragged Thomas, Moore approached Edwards with her phone in her hand and her arm extended toward Edwards. See id. at 00:03:25–00:03:27. Edwards knew it was a phone and not a weapon. See DMBSMF ¶ 103. The parties dispute the speed and nature of her approach towards Edwards. See DMBSMF ¶¶ 103, 108; PSMFBM ¶¶ 103, 108. The parties agree that Moore was approaching Edwards while yelling and closing the ground between them. See MBWC 00:03:25–00:03:27. When Moore was within an arms-length distance, Edwards stopped dragging Thomas and stepped forward to strike Moore in the face. Compare DESMF ¶ 109 and DMBSMF ¶ 105, with PSMFBM ¶ 105. The parties dispute whether Edwards hit Moore with an open palm or a closed fist. Compare DESMF ¶ 109 and DMBSMF ¶ 107, with PSMFBM ¶ 107. Moore fell backwards onto the asphalt, got up, and retreated toward her car. See MBWC 00:03:28–00:03:30; DESMF ¶ 111; PSMFE ¶ 111; DMBSMF ¶ 113; PSMFBM ¶ 113. Edwards followed Moore while Mizelle held Thomas on the ground. Compare DMBSMF ¶ 115, with PSMFBM ¶ 115. Once Edwards caught up to Moore, he grabbed her right arm and moved it behind her. See Main Entrance Camera ("MEC") [D.E. 87-11] 00:31:20–00:31:22. The main entrance footage shows Moore pulling away from Edwards as he tried to grab her arm. See id. at 00:31:19–00:31:23. Moore contends that Edwards struck her with a closed fist again, forcing her headfirst into the asphalt. But the video evidence shows that Edwards did not punch Moore. See id. at 00:31:21–00:31:23. Rather, Edwards grabbed Moore's arm and pushed her forward, so she fell face-first into the asphalt. See id. at 00:31:22–00:31:25. Moore tried to sit up after the fall. See id. at

7

00:31:30–00:31:35. But Edwards put his knees on Moore's back and pushed her down using his body weight. See id. Edwards then handcuffed Moore, stood her up, and walked her to the courthouse steps. See DESMF ¶ 119; PSMFE ¶ 119; DMBSMF ¶ 129; PSMFBM ¶ 129.

While Edwards was engaged with Moore, Mizelle held Thomas on the ground. The parties dispute whether Thomas resisted, although he can clearly be heard yelling for Edwards to get off his aunt. See MBWC 00:03:49–00:04:17. Plaintiffs assert that Mizelle was holding Thomas in the prone position and applying pressure to his handcuffs while Edwards arrested Moore. See PSMFBM ¶ 131; DMBSMF ¶ 131. But Mizelle's body worn camera shows Thomas laying on his right side, not his stomach. See MBWC 00:03:38–00:04:28. Mizelle put Thomas in the prone position once Thomas started moving around on the ground and yelling "leave me by myself." See id. at 00:04:25–00:04:30. Mizelle can be heard telling Thomas to "calm down," "stop fighting," and "stop resisting." See id. at 00:04:02–00:04:05, 00:04:31–00:04:35, 00:04:41–00:04:45. After Moore was apprehended, Edwards called Plymouth Police Department ("PPD") for backup and returned to help Mizelle take Thomas into the courthouse. See DESMF ¶ 121; PSMFE ¶ 121. Compare DBMSMF ¶ 132, with PSMFBM ¶ 132.

Edwards and Mizelle supported Thomas's arms and walked him to the front of the courthouse. See DESMF ¶ 94; DBMSMF ¶ 134; PSMFBM ¶ 134. Mizelle got Thomas to the top of the steps and turned back toward the parking lot. See MEC 00:32:35–00:32:39. At the top of the steps, Edwards had his right arm under Thomas's left arm, and his hand on the back of Thomas's neck. See MEC 00:32:37; DBMSMF ¶ 138; PSMFBM ¶ 138. The parties dispute whether Thomas was resisting, but the video shows Thomas pull backwards, trying to avoid going down the stairs. See MEC 00:32:37–00:32:39. Compare DBMSMF ¶ 137, with PSMFBM ¶ 137. What happens next is heavily disputed, and the video evidence does not provide clarity. Edwards

8

contends that he and Thomas fell down the stairs accidentally. See DESMF ¶ 133. But Thomas asserts that Edwards pushed him down the stairs. Specifically, Thomas testified that Edwards picked him up off the ground and drove his knee into his back. See DESMF ¶ 135; PSMFE ¶ 135. There is no dispute that Thomas went headfirst into the courthouse's brick wall. See MEC 00:32:42–00:32:45.

Goddard, Moore, and Gilliam witnessed the fall and started screaming. See DESMF ¶ 138; PSMFE ¶ 138. Thomas was not moving and appeared unresponsive. See DESMF ¶ 141; PSMFE ¶ 141. Edwards pressed the button to gain entry to the courthouse, grabbed Thomas's left arm, and dragged him into the courthouse lobby. See DESMF ¶ 144; PSMFE ¶ 144; DBMSMF ¶ 182; PSMFBM ¶ 182. Mizelle held the door and followed closely behind. See MEC 00:32:53–00:32:58. Edwards dragged Thomas inside because Goddard and Gilliam were creating a risk to the officers' safety. See DESMF ¶ 145.

As Edwards dragged Thomas inside, PPD officers, Defendant White and Defendant Phelps, arrived. See DESMF ¶ 146; PSMFE ¶ 146; DBMSMF ¶ 158; PSMFBM ¶ 158. Compare Def. Williams's, Phelps's, and White's Statement of Material Fact ("DWPWSMF") ¶ 1, with Pl.'s Statement of Material Fact for Williams, Phelps, and White ("PSMFWPW") ¶ 1. Phelps and White responded to Edwards's request for assistance because they heard Edwards out of breath and people yelling in the background. Compare DWPWSMF ¶ 1, with PSMFWPW ¶ 1. As Phelps and White approached the courthouse steps, Edwards left Thomas on the lobby floor and exited the courthouse door toward Moore. See MBWC 00:05:19–00:05:23; MEC 00:29:58–00:33:03. Moore was seated on the courthouse steps in handcuffs. See MBWC 00:05:19–00:05:23; MEC 00:29:58–00:33:03. Without warning, Edwards grabbed Moore by her jacket, forcing her off the steps. See MBWC 00:05:22–00:05:24, 00:05:26–00:05:28. Moore turned away from Edwards to

talk to Defendant White. See White's Body Worn Camera ("WBWC") [D.E. 87-3] 00:00:01–00:00:03. Edwards then put his hand on Moore's neck and pushed her into the lobby. See MBWC 00:05:26–00:05:28; WBWC 00:00:01–00:00:03. The video evidence shows that Edwards did not use a chokehold. Rather, he pushed on Moore's neck for about one second. See WBWC 00:00:01–00:00:02. Phelps and White followed behind and held the door to the lobby open while Goddard and Gilliam screamed and cried. See DESMF ¶ 154; MBWC 00:05:37–00:05:56.

At this point, Thomas was laying on his side in the lobby and Moore was standing behind him. Edwards flipped Thomas onto his back and lifted him by his sweatshirt. See MBWC 00:05:54–00:06:06. Thomas yelled, and Edwards declared, "He's awake." Id.; DESMF ¶ 153; PSMFE ¶ 153. Once the elevator opened, Edwards grabbed Thomas by his right shoulder, supported his neck, and dragged him into the elevator. See Phelps Body Worn Camera ("PBWC") [D.E. 87-1] 00:00:47–00:00:52; WBWC 00:00:51–00:00:53. Thomas put his feet flat on the floor and walked backwards to avoid being dragged. See MBWC 00:06:15–00:06:18. Phelps then ran into the lobby, yelling "whoa, whoa, whoa" and "time out." See PBWC 00:00:49–00:01:00. Gilliam entered the lobby behind Phelps. Phelps told Gilliam to back up before White escorted her outside. See WBWC 00:01:06–00:01:51. Edwards claimed he felt an immediate need to get Thomas and Moore upstairs. See DBMSMF ¶ 190. As Phelps entered the elevator behind Edwards, Edwards held Thomas's left leg. See PBWC 00:00:59–00:01:05. Edwards then pulled both of Thomas's legs into the elevator before kneeling on Thomas's left leg. See id. at 00:01:10–00:01:25; DESMF ¶ 162; PSMFE ¶ 162. The parties dispute why Edwards kneeled on Thomas. Edwards, Barnes, and Mizelle assert that Edwards kneeled on Thomas's leg because Thomas was trying to keep the elevator door open. See DESMF ¶ 163; DBMSMF ¶¶ 202–03. Plaintiffs argue Thomas was doing no such thing. See PSMFBM ¶¶ 202–03. Mizelle then ushered Moore into the

10

elevator. See DESMF ¶ 166; PSMFE ¶ 166. Edwards, Phelps, Mizelle, Thomas, and Moore rode

up to the third-floor jail. See DESMF ¶ 167; PSMFE ¶ 167; DBMSMF ¶ 204; PSMFBM ¶ 204.

While riding up, Phelps asked Thomas if he was going to stand up. See PBWC 00:02:00–00:02:03.

Thomas responded that he might pass out and requested medical help. See id. at 00:02:03–

00:02:08.

Once the elevator arrived on the third floor, Moore and Mizelle exited. See DBMSMF ¶

209; PSMFBM ¶ 209. Phelps asked Thomas to stand up. See PBWC 00:02:38–00:02:40. Thomas

asked Phelps to "give [him] a second." See id. at 00:02:41–00:02:43. Thomas then rolled onto

his side and appeared unresponsive. See id. at 00:03:00–00:03:28. The parties dispute whether

Thomas passively resisted the officer's orders or was unresponsive and unable to stand because of

his injuries. At this point, Phelps radioed for Emergency Medical Services ("EMS") for both

Thomas and Moore, who was bleeding from her mouth. See id. at 00:03:26–00:03:31. Thomas

told Phelps he was scared for his life and not to let Edwards touch him. See id. at 00:04:01–

00:04:22. Phelps, once again, repeatedly asked Thomas to stand up, but Thomas rolled over and

stopped responding. See id. at 00:04:39–00:04:52. At this point, Edwards grabbed Thomas's left

pant leg and belt and dragged him out of the elevator and onto the jail lobby floor. See id. at

00:04:52–00:05:02. Compare DBMSMF ¶ 213, with PSMFBM ¶ 213. Edwards then rolled

Thomas into a prone position before Thomas sat back up on his buttocks. See PBWC 00:05:00–

00:05:02, 00:06:28–00:06:34. Although the parties dispute Thomas's and Moore's demeanor, the

video shows that Thomas and Moore continuously yelled about Edwards's conduct. See id. at

00:06:00–00:07:00. After a couple minutes, Thomas stood up while addressing Phelps. See id. at

00:07:10–00:07:12. Compare DBMSMF ¶ 219, with PSMFBM ¶ 219. Edwards grabbed the back

of Thomas's shirt, and Thomas told Edwards to "get off" him because he "ain't did shit." See

11

PBWC 00:07:12–00:07:15. Edwards responded "yes you have." Edwards did not direct Thomas to sit down. See id. at 00:07:12–00:07:18. Rather, Edwards pushed on Thomas's right shoulder, kicked Thomas's right leg out from underneath him, and brought him to the ground. See id. at 00:07:14–00:07:19; MBWC 00:12:37–00:12:44. Phelps, once again, yelled "whoa, whoa, whoa" and approached Edwards and Thomas after the leg sweep. See PBWC 00:07:20–00:07:24. Thomas continued to yell about Edwards and asked Phelps to hold Edwards responsible. See id. at 00:07:29–00:08:53.

Approximately two minutes later, White arrived on the third floor in the elevator. See WBWC 00:08:52–00:08:56. Phelps joined White in the elevator and the two headed downstairs to the courthouse lobby. See DBMSMF ¶ 229; PSMFBM ¶ 229. While riding down to the first floor, Phelps told White he wanted "no part of" what he just witnessed. See PBWC 00:09:40–00:10:00. He stated that he had never seen anything like Edwards's behavior, including dragging Thomas on and off the elevator. See id. He then retreated to his vehicle and called Chief Deputy Arlo Norman ("Chief Deputy Norman") to report his concerns. See id. at 00:12:34–00:12:38. Approximately ten minutes later, EMS arrived to treat Moore and Thomas. See DESMF ¶ 189; PSMFE ¶ 189. Thomas did not comply with the initial vital check; therefore, EMS did not examine or treat him. See DESMF ¶ 198; PSMFE ¶198. EMS treated Moore for a "minor lip laceration to the upper lip." See DESMF ¶ 199; PSMFE ¶199.

At approximately 5:10 a.m., Edwards and Mizelle escorted Thomas and Moore to the second floor to see the magistrate. See DESMF ¶ 203; PSMFE ¶ 203. The magistrate determined that probable cause existed to charge Moore with resist, delay, obstruct ("RDO") under North Carolina law. See DESMF ¶ 210; PSMFE ¶ 210. The magistrate also found probable cause to charge Thomas with possession with intent to sell and deliver, possession of drug paraphernalia,

12

exceeding the posted speed limit, careless and reckless driving, and driving with a revoked license. See DESMF ¶ 218; PSMFE ¶ 218. Both Moore and Edwards were then confined in the Washington County Jail. See DESMF ¶¶ 210, 218; PSMFE ¶¶ 210, 218.

On March 8, 2022, six days after the incident, Sheriff Barnes fired Edwards. See DESMF ¶ 220; PSMFE ¶ 220. On March 10, 2022, Washington County posted a statement on social media about the incident. See DESMF ¶ 221; PSMFE ¶ 221. The post included a quote from Sheriff Barnes, which reads in part: "[T]his incident went beyond the scope of acceptable force and will not be tolerated in this office." See DESMF ¶ 221; PSMFE ¶ 221. Barnes later testified that he fired Edwards for "poor decision making," not his use of force. Compare DESMF ¶ 233, with PSMFE ¶ 233. After Sheriff Barnes fired Edwards, the district attorney's office dropped the charges against Moore and Thomas. See DESMF ¶ 225; PSMFE ¶ 225. The district attorney's office also declined to charge Edwards. See DESMF ¶ 226; PSMFE ¶ 226.

## II.

Defendants move to exclude Albert Vangura's ("Vangura") expert report under Federal Rule of Evidence 702. See [D.E. 80]. In his report, Vangura opines about the biomechanics of the interactions between plaintiffs and Defendant Edwards, the proximate cause of plaintiffs' injuries, and whether Edwards struck Moore with a closed fist. In their motion in limine to exclude Vangura's opinions and testimony, plaintiffs argue that the court should exclude Vangura's report and testimony because the report and testimony lack reliability and relevance and include opinions Vangura is not qualified to make. See [D.E. 80-1] 1–2.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142–43 (1997); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588

13

(1993); Engilis v. Monsanto Co., ___ F.4th ___, 2025 WL 2315898, at *3–6 (9th Cir. 2025); United

States v. Forrest, 429 F.3d 73, 80–81 (4th Cir. 2005); Silicon Knights, Inc. v. Epic Games, Inc.,

No. 5:07-CV-275, 2011 WL 6748518, at *5–6 (E.D.N.C. Dec. 22, 2011) (unpublished).  Rule 702

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will
> > help the trier of fact to understand the evidence or to determine a fact in
> > issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and
> > methods to the facts of the case.

Fed. R. Evid. 702.[1]  "In 2023, Rule 702 was amended to clarify that the proponent of expert

testimony bears the burden of establishing its admissibility and to emphasize that an expert's

opinion must stay within the bounds of a reliable application of the expert's basis and

methodology."  EcoFactor, Inc. v. Google LLC, 137 F.4th 1333, 1339 (Fed. Cir. 2025); see also

Fed. R. Evid. 702 advisory committee note to 2023 amendment (stating that the 2023 amendment

is intended "to emphasize that each expert opinion must stay within the bounds of what can be

concluded from a reliable application of the expert's basis and methodology").

---

[1] Although Rule 702 governs trial testimony, a trial court may conduct a Rule 702 analysis
in resolving a summary judgment motion and "exclude expert testimony found wanting from its
consideration in ruling on [such a] motion."  Arsanjani v. United States, No. 19-1746, 2023 WL
3231101, at *3 (D.D.C. May 3, 2023) (unpublished) (quotation and citation omitted), aff'd, No.
23-5109, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024) (unpublished).

14

Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see Engilis, 2025 WL 2315898, at *3–6; Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199–203 (4th Cir. 2001). In other words, Rule 702 requires that a trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." EcoFactor, 137 F.4th at 1339 (internal quotations omitted) (citation omitted); see Daubert, 509 U.S. at 597–98; Engilis, 2025 WL 2315898, at *3–6. Determining admissibility, which falls within the gatekeeping role of the court, is separate from determining "weight and credibility, which are within the province of the jury in a jury case." EcoFactor, 137 F.4th at 1339.

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; see Fed. R. Evid. 104(a); Daubert, 509 U.S. at 592 n.10; Engilis, 2025 WL 2315898, at *5–6; Cooper, 259 F.3d at 199; see also Huddleston v. United States, 485 U.S. 681, 687 n.5 (1988); Bourjaily v. United States, 483 U.S. 171, 175 (1987). Expert testimony is appropriate when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). A district court may permit a witness qualified by knowledge, skill, experience, training, or education to testify and state an opinion where the testimony will help the trier of fact understand the evidence or determine a fact in issue and "([1]) the testimony is based on sufficient facts or data, ([2]) the testimony is the product of reliable principles and methods; and ([3]) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). Courts have distilled Rule 702's requirements into three crucial inquiries: (1) whether the proposed expert witness is qualified; (2) whether the proposed testimony is relevant; and (3) whether the proposed testimony is reliable. See Kumho Tire Co., 526 U.S. at 141; Daubert, 509 U.S. at 589; Engilis, 2025 WL 2315898, at *5–6; Forrest,

429 F.3d at 80. The trial court must perform its special gatekeeping obligation concerning these three requirements. See, e.g., Fed. R. Evid. 702; Kumho Tire Co., 526 U.S. at 147; Engilis, 2025 WL 2315898, at *5–6.

When a party challenges an expert's testimony, the court must "satisfy itself that the proffered testimony meets the relevant standard as a precondition to admissibility." Snell v. Reid, No. 22-1869, 2024 WL 2815061, at *3 (4th Cir. June 3, 2024) (per curiam) (unpublished) (quotations omitted); see Engilis, 2025 WL 2315898, at *5–6; Sardis v. Overhead Door Corp., 10 F.4th 268, 282 (4th Cir. 2021). The court must make explicit findings concerning the challenged preconditions of admissibility either by written order or orally on the record. See Snell, 2024 WL 2815061 at *3; Sardis, 10 F.4th 268 at 283; United States v. Smith, 919 F.3d 825, 835–36 (4th Cir. 2019).

As for qualification, an expert may be qualified based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court assesses qualifications in reference to the matter to which the witness seeks to testify. See Daubert, 509 U.S. at 591–93; Gladhill v. Gen. Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984). The witness need not be the most well-known or well-qualified witness. See Gladhill, 743 F.2d at 1052. Nonetheless, a witness does not become an expert simply by claiming to be an expert or because some other court permitted the witness to testify as an expert. See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799–800 (4th Cir. 1989) (holding that a witness with an MBA was not qualified to provide expert opinion testimony on complex economic antitrust matters about which the witness was not qualified by training, experience, or education); United States v. Bahena, 223 F.3d 797, 809–10 (8th Cir. 2000) (holding that a witness who held himself out to be an expert on voice spectrography lacked the required training, experience, or education). Moreover, expertise in one topic does not qualify a

16

witness to testify about another topic. See, e.g., Engilis, 2025 WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); Brainchild Surgical Devices, LLC v. CPA Glob. Ltd., 144 F.4th 238, 254 (4th Cir. 2025) (affirming exclusion of expert with experience in international business and contracts to opine on patent renewal services where the expert lacked training or experience with patent renewal services); Kadel v. Folwell, 100 F.4th 122, 158 (4th Cir. 2025) (en banc) (affirming exclusion of medical doctors' testimony where doctors failed to demonstrate expertise in treating the medical condition at issue in the case), vacated on other grounds by Folwell v. Kadel, 145 S. Ct. 2838 (2025) (mem.); Sardis, 10 F.4th at 288–90, 295 (affirming exclusion of testimony about an industry standard not sufficiently related to the product at issue and excluding testimony that contradicts standards imposed by governing law); Zellers v. NexTech Ne., LLC, 533 F. App'x 192, 197 (4th Cir. 2013) (per curiam) (unpublished) (affirming exclusion of a neurologist's testimony about the toxicity of certain chemicals used for refrigeration because the neurologist had no training in toxicology); Cooper, 259 F.3d at 200–04 (affirming exclusion of a medical doctor's testimony where the medical doctor based an opinion on a medical device without conducting tests or studying the medical device); Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998) (affirming exclusion of testimony when the expert failed to visit the site of the accident or otherwise familiarize himself with the specific details of the accident at issue).

To be relevant, the proposed expert testimony must be helpful to the trier of fact concerning the evidence or a fact at issue in the case. See Fed. R. Evid. 702(a); Daubert, 509 U.S. at 591–92; United States v. Lespier, 725 F.3d 437, 449 (4th Cir. 2013); Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993); Persinger v. Norfolk & W. Ry., 920 F.2d 1185, 1188 (4th Cir. 1990); Scott v. Sears,

17

Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986). To be helpful, the proposed expert testimony

must fit the facts of the case. See Fed. R. Evid. 702; Silicon Knights, Inc., 2011 WL 6748518, at

*6–17. "Fit is not always obvious, and scientific validity for one purpose is not necessarily

scientific validity for other, unrelated purposes." Daubert, 509 U.S. at 591 (quotation omitted).

To be helpful to the trier of fact, the proposed expert testimony must be outside the common

knowledge or function of the fact finder. See, e.g., Lespier, 725 F.3d at 449 (affirming exclusion

of expert testimony on how sleep deprivation affects the reliability of an eye witness to a crime);

Persinger, 920 F.2d at 1188 (affirming exclusion of expert testimony about the weight an individual

could safely lift based on an easily-applied industry formula); Gladhill, 743 F.2d at 1052 (affirming

decision that a police officer who had investigated 600 car accidents and arrived at the car accident

scene immediately after the car accident was qualified to opine on the cause of the car accident

based on his review of the car accident scene); cf. United States v. Hill, 749 F.3d 1250, 1260 (10th

Cir. 2014) (holding that an expert witness cannot testify about whether another witness is credible);

Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005) (same).

　　　　Expert testimony may be relevant in excessive force cases. A jury must determine

"whether a reasonable officer in the same circumstances would have concluded that a threat existed

justifying the particular use of force." Clem v. Corbeau, 98 F. App'x 197, 200–01 (4th Cir. 2004)

(per curiam) (unpublished) (quotation and citation omitted); Elliott v. Leavitt, 99 F.3d 640, 642

(4th Cir. 1996). Thus, with this specific "reasonable officer" standard, "specialized knowledge"

from an expert may help the jury's understanding in certain circumstances. Kopf, 993 F.2d at 378;

see Clem, 98 F. App'x at 201. "Where force is reduced to its most primitive form—the bare

hands—expert testimony might not be helpful. Add handcuffs, a gun, a slapjack, mace, or some

other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using

a gun? how much damage can a slapjack do? Answering these questions may often be assisted by expert testimony." Kopf, 993 F.2d at 379. If the case, however, does not involve one of these specialized tools and the "only relevant testimony involve[s] opinions, given the[] [expert's] particular interpretations of the contested facts," then the expert's opinion "risk[s] 'supplant[ing] a jury's independent exercise of common sense' and its role of determining the facts." Clem, 98 F. App'x at 201; Kopf, 993 F.2d at 377.

"[T]he test of reliability is flexible and the law grants a district court" discretion when it decides reliability. United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quotations and citation omitted); see Kumho Tire Co., 526 U.S. at 141–42; Belville v. Ford Motor Co., 919 F.3d 224, 233 (4th Cir. 2019). Reliability focuses on the fit between the expert opinion and the facts of the case. There is not a fit when a large analytical gap exists between the facts of the case and the opinion. See, e.g., Joiner, 522 U.S. at 146–47 (affirming exclusion of testimony where the expert's opinion was based on irrelevant testing on animals unrelated to the case at issue); Engilis, 2025 WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig., 892 F.3d 624, 634–35, 644 (4th Cir. 2018) (affirming exclusion of testimony when the expert's testing contradicted his opinion); Nease v. Ford Motor Co., 848 F.3d 219, 232–33 (4th Cir. 2017) (affirming exclusion of testimony when expert on vehicle safety failed to test his own hypothesis); Cooper, 259 F.3d at 200–01 (affirming exclusion of testimony on what caused a medical injury when the expert's testing did not provide evidence of causation); Silicon Knights, Inc., 2011 WL 6748518, at *6–17 (excluding expert on damages where the opinions did not fit the facts of the case). Rule 702 does not permit

19

or require "a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Joiner, 522 U.S. at 146; see Small v. WellDyne, Inc., 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"); In re Roundup Prods. Liab. Litig., MDL No. 2741, 2023 WL 7928751, at *2–6 (N.D. Cal. Nov. 15, 2023) (unpublished) ("For an expert to express an opinion that Roundup cause[d] [Non-Hodgkins Lymphoma], that expert must have engaged with the relevant literature enough to assess whether a study is credible, to explain why [he] relied on one study more than another, and to articulate how [he] reached [his] conclusion in the face of conflicting evidence. [The expert in this case] did not do that, so his general causation opinion is excluded."), aff'd sub nom., Engilis, 2025 WL 2315898.

In determining "whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 & n.1 (4th Cir. 1999). Factors that may bear on the reliability of the expert's testimony include (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application, and (4) whether the theory or technique enjoys general acceptance within the relevant community. See Kumho Tire Co., 526 U.S. at 149–50; Daubert, 509 U.S. at 593–94; see, e.g., Engilis, 2025 WL 2315898, at *7–10 (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential

20

etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer); Sardis, 10 F.4th at 288–90 (holding testimony about product safety unreliable when expert did not test the product); McKiver v. Murphy-Brown, LLC, 980 F.3d 937, 960 (4th Cir. 2020) (holding that a witness's method for analyzing the origin of swine fecal material was widely used and applied reliably enough to be admitted despite not being subject to peer review); In re Lipitor, 892 F.3d at 644–45 (holding that a medical doctor testifying that Lipitor caused certain diseases was excludable for not factoring in other risk factors, such as age, body mass index, and family history); Baxter v. Comm'r of Internal Revenue Serv., 910 F.3d 150, 157–58 (4th Cir. 2018) (holding that mere disagreement with an expert's otherwise reliable economic methodology is not grounds for exclusion); United States v. Crisp, 324 F.3d 261, 265–70 (4th Cir. 2003) (holding that expert fingerprint analysis was admissible despite defendant's objections to its general scientific accuracy). "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." In re Lipitor, 892 F.3d at 634; see E.E.O.C. v. Freeman, 778 F.3d 463, 468–70 (4th Cir. 2015) (Agee, J., concurring) (collecting cases).

Defendants Edwards, Barnes, and Mizelle offer the report and testimony of Vangura to opine on the biomechanics of the interactions between Edwards and plaintiffs, the cause of plaintiffs' injuries, and the position of Edwards's hand when he struck Moore. Plaintiffs make three arguments: (1) Vangura's report and testimony are not reliable because he has demonstrated no methodology or principles on which he relies; (2) Vangura's report and testimony are not relevant because they speak to common sense issues and risk tainting the jury's independent judgment; and (3) Vangura is not qualified to opine on either law enforcement practices and tactics or the specific cause or existence of the parties' injuries. See [D.E. 80-1] 1–2.

21

As for reliability, plaintiffs argue that Vangura's report and opinion lack any reliable or recognized methodology; therefore, the court should exclude them. See id. at 20. Vangura does not identify methods or principles underlying his "bioengineering and biomechanical engineering investigation and analyses." See [D.E. 70-16] 3. In fact, when asked about his methodology, Vangura responded that he used the ASTM E620-18. See Vangura Dep. [D.E. 80-3] 46. The ASTM E620-18 is not a methodology. It is three pages of standards about forensic or technical reports an expert can use in any field. In other words, it tells the expert how to write their report, not the methodology the expert should follow. See Davis v. Cisneros, No. 1:21-CV-565, 2024 WL 3799461, at *8 (W.D. Tex. Aug. 12, 2024) (unpublished) (stating that the ASTM E620-18 does not provide sufficient methodology because it does not direct the expert how to conduct his analysis in the specific field and "[t]o accept this standard as sufficient methodology would be to allow any purported expert to be qualified under Daubert").

Defendants argue that Vangura's report is reliable because it cites multiple "peer-reviewed articles" to support his conclusions. See [D.E. 111] 12; [D.E. 117] 6–7. But the articles primarily provide background information and do not directly support Vangura's conclusions or methodology. See [D.E. 70-16] 70–73 (citing articles about blunt force trauma to the face, face lacerations, and the biomechanics of walking). Vangura's report mentions that he uses "generally accepted [methodologies] accepted in the biomechanical and scientific communities," and cites four sources about accidental injuries and biomechanic basics to support this claim. See id. at 13–14 & n.1–4. Vangura, however, only uses one of the cited sources in his report, and he misapplies it. Specifically, Vangura cites Accidental Injury, a book that "look[s] at the applied biomechanics of accidental injur[ies]." Alan M. Nahum et al., Accidental Injury: Biomechanics and Prevention (3d ed. 2015); Accidental Injury, Springer Nature Link,

22

https://link.springer.com/book/10.1007/978-1-4939-1732-7 (last visited Sept. 29, 2025) (emphasis added). Vangura uses findings from Accidental Injury to analyze Moore's facial injuries. See [D.E. 70-16] 71. It is undisputed that Defendant Edwards struck Moore in the face intentionally; thus, "[o]bservations from accidental injuries" are irrelevant and inapplicable. Id. This fact undermines the reliability of Vangura's report.

Defendant Edwards argues that it is generally accepted that biomechanical experts can offer opinions about the forces generated from specific events, the effects of those forces operating upon the human body, and injuries that can result from them. [D.E. 112] 14. The court agrees that biomechanics experts may be qualified to speak on such issues, but the methods and principles underlying these findings must be present and reliable. In fact, all parties cite cases that demonstrate the various principles and methods that biomechanics experts can use to reach permissible opinions. See Ingram v. Cnty. of Camden, No. CV 14-5519 (JBS-KMW), 2019 WL 1418119, at *7 (D.N.J. Mar. 29, 2019) (unpublished) (permitting a biomechanics expert's testimony because he "performed a necessary study and explanation of the amount of force, given [the individual's] physical characteristics"); Robinson v. Lambert, No. 6:15-CV-1896-Orl-22LRH, 2019 WL 7971852, at *6 (M.D. Fla. Dec. 18, 2019) (unpublished) (permitting a biomechanics expert's testimony after he provided ranges for the amount of force required to cause the injury and error rates for his calculations); Ramirez v. Escajeda, No. EP-17-CV-193-DCG, 2021 WL 1131721, at *12 (W.D. Tex. Mar. 24, 2021) (unpublished) (finding expert reliable because she "relie[d] on nine biomechanical studies" pertaining to the issues in the case, used "Newton's Laws of Physics" and various "biomechanical principles," and her consulting group peer-reviewed her report). Vangura fails to show that his report and opinions rest on similar principles and methods. Additionally, biomechanics experts frequently address causation issues, but experts addressing

23

causation must demonstrate how and why they eliminated other causes when reaching their conclusions. See Belville, 919 F.3d at 234 (affirming exclusion of expert testimony where "a considerable gap" existed between the expert's theory and "any evidentiary proof of causation"); Nease, 848 F.3d at 232–33; Cooper, 259 F.3d at 203 (noting that an expert's failure to eliminate other potential causes rendered the expert's opinion "little more than speculation"). Here, Vangura never mentions if or how he eliminated other causes when he opines on proximate cause.

Next, Defendants Barnes and Mizelle cite Hook v. Whiting Door Manufacturing Corp., where Vangura testified as an expert, and argue that Vangura's methodology is reliable here because the court in Hook found his methodology reliable there. See [D.E. 111] 10–12; No. CV 3:15-281, 2019 WL 630324, at *11 (W.D. Pa. Feb. 14, 2019) (unpublished). But Defendants Barnes and Mizelle fail to show that the methodologies are comparable. Compare [D.E. 70-16] (failing to explain the application of any methods, principles, or calculations to the facts when reaching conclusions, such as deeming Thomas's fall "accidental"), with Hook, 2019 WL 630324, at *5 (stating that Vangura's methodology was reliable because "Vangura calculated the force that Mr. Hook must have exerted," "the force required to cause Mr. Hook's injuries," and "based this calculation on Mr. Hook's weight, the height of the Trailer, and the velocity necessary to cause the types of injuries that Mr. Hook sustained"). Thus, the court rejects this argument.

Expert testimony may be admissible even though it "does not rely on anything like a scientific method." Wilson, 484 F.3d at 274–75; Bynum, 604 F.3d at 167. But the expert must "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (cleaned up). Vangura fails to demonstrate how his experience as a biomechanics expert specializing in products liability and vehicle crashes led him to his conclusions, why that

24

experience suffices to support his findings in an excessive force case, or how he applied that experience to the video evidence here.

Defendants also argue that plaintiffs' arguments go to the weight of Vangura's testimony rather than admissibility. See [D.E. 111] 12–13. Defendants misunderstand Rule 702. The court recognizes that "questions regarding the factual underpinnings of" an expert's opinion "affect the weight and credibility of the witness'[s] assessment, not its admissibility." Sommerville v. Union Carbide Corp., 149 F.4th 408, 423 (4th Cir. 2025) (quotation and citation omitted). The proponent of an expert witness, however, must first demonstrate by a preponderance of the evidence that the expert's testimony answers the "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology." Fed. R. Evid. 702 advisory committee note to 2023 amendment; Joiner, 522 U.S. at 141–42; Engilis, 2025 WL 2315898, at *7–10; Sardis, 10 F.4th at 284; Belville, 919 F.3d at 233; In re Lipitor, 892 F.3d at 644–45; Nease, 848 F.3d at 232–33; Cooper, 259 F.3d at 200–01. Defendants have failed to prove that Vangura's report and testimony meet this threshold inquiry. Vangura's failure to explain his methodology and apply it to the facts of the case goes to the reliability of Vangura's report and testimony, not the weight.

Vangura's report and testimony are his subjective "belief or speculation." Small, 927 F.3d at 177. The court will not accept Vangura's methodology and findings as reliable merely because Vangura "says so." See Joiner, 522 U.S. at 146; Small, 927 F.3d at 177. The court finds that Vangura's report and testimony lack reliability. Thus, the court excludes Vangura's report and testimony.

Alternatively, even if Vangura's opinions and report are reliable, plaintiffs argue that the court should exclude Vangura's opinions and testimony based on relevance and qualification. As for relevance, plaintiffs argues that Vangura's testimony consists of common sense observations.

25

See [D.E. 80-1] 2. Vangura spends most of his report narrating and characterizing the video evidence, which requires no specialized knowledge and is within the function of the jury. Lespier, 725 F.3d at 449; Persinger, 920 F.2d at 1188; Gladhill, 743 F.2d 1052. Vangura describes the sights, sounds, force, and resistance that any jury can perceive. In doing so, Vangura infuses his report with irrelevant and potentially prejudicial opinions that risk tainting the jury's independent judgment. See, e.g., [D.E. 70-16] 25 ("Thomas makes aggressive and provocative statements." (emphasis added)); id. at 31 ("Thomas'[s] mother and Moore approach closer agressively [sic] shouting expletives." (emphasis added)); id. at 67 ("Edwards['s] application of tripping or leg sweeping was an effective tool to control Thomas who was actively and agressively [sic] resisting against Edwards all the while Thomas and Moore continued to verbally harrass [sic] all the officers involved, most of all, Edwards." (emphasis added)); id. at 67, 75 (describing Plaintiff Edwards as "unruly"). The jury can watch, listen, and form opinions on the video without Vangura's commentary. Additionally, the jury can make judgments about the perceived force and the plaintiffs' perceived resistance. In fact, this case involves force "in its most primitive form—the bare hands." Kopf, 993 F.2d at 379. Thus, the court finds that expert testimony on the force used in the video will not help the jury. See id.

Beyond the video narration, Vangura's discussion and findings include opinions and testimony that fall within the common knowledge and function of the jury. See, e.g., [D.E. 70-16] 73 (describing the biomechanics of walking); id. at 75 ¶ 1 (finding that Thomas walked to the courthouse steps and was not dragged); id. at 75 ¶ 2 (finding that Edwards and Thomas lost their balance, and thus, the fall was accidental); id. at 75 ¶¶ 3–5 (finding that in the absence of resistance, Thomas and Edwards would not have fallen and become injured); id. at 75 ¶ 6 (finding that Thomas was trying to trip Edwards by extending his leg in and out); id. at 75 ¶ 9 (finding the leg sweep

controlled Thomas while "Thomas and Moore continued to verbally harrass [sic]" the officers); id. at 75 ¶ 11 (finding that if Thomas was not resisting, Edwards would not need to do a rapid takedown to control him); id. at 76 ¶ 14 (finding that Moore interfered with the officers as they transported Thomas to the courthouse); id. at 76 ¶ 15 (finding that Moore approached Edwards in an aggressive and threatening manner); id. at 76 ¶¶ 17–18 (finding that if Moore had not threatened Edwards and created a "dangerous condition," he would not have struck her); id. at 76 ¶¶ 23–24 (finding that a proximate cause of the accidental fall down the steps was Thomas's active resistance and if Thomas had not fallen, he would not be injured). Vangura admits that he made findings by simply "watching this video," a factfinding exercise that is well within the jury's function. Vangura Dep. 47, 103 (stating that he uses a videography technique, which is "the ability to look at video" and "make judgments off it"). Thus, the court finds that these findings "risk[] 'supplant[ing] a jury's independent exercise of common sense' and its role of determining the facts." Clem, 98 F. App'x at 201; Kopf, 993 F.2d at 377.

Defendants Barnes and Mizelle respond that the video evidence does not affect whether Vangura's testimony is relevant. See [D.E. 111] 10. In support, defendants cite a case from the United States District Court for the Southern District of Mississippi, to argue that even when video evidence is present, a biomechanical expert can still testify about body movements, injury comparisons, and the force applied. See Hernandez v. Causey, No. 2:17-CV-123-TBM-MTP, 2021 WL 1771876 (S.D. Miss. May 4, 2021) (unpublished), on reconsideration, No. 2:17-CV-123-TBM-MTP, 2022 WL 4594023 (S.D. Miss. Sept. 29, 2022) (unpublished), aff'd, 124 F.4th 325 (5th Cir. 2024). In Hernandez, the court found that the expert testimony was relevant "specifically" to Hernandez's hand position when the shooting occurred because the video did not show the hand position. See id. at *11. Thus, the expert testimony helped the jury make that

27

determination. See id. Here, in contrast, the video captured the entire incident with one exception, the position of Edwards's hand when he struck Moore in the face. Edwards's hand position is not a material fact in this case. Thus, Hernandez does not help defendants.

As for qualification, plaintiffs argue that Vangura is not qualified to opine about law enforcement tactics and practices or the parties' injuries and medical conditions. See [80-1] 6–15. Vangura has an associate's degree in mechanical engineering technology, a bachelor's in exercise and sports science, and a master's in bioengineering. See [D.E. 70-16] 7. Vangura does not have a medical degree. See Vangura Dep. 20. Vangura has "nearly forty years of experience in product design, development, manufacturing, and testing with twenty-five of those years in medical devices." [D.E. 70-16] 7. Additionally, for 20 years, Vangura has worked as a "forensic expert in biomechanics, bioengineering, and product development." See id. Vangura has no professional publications from the last four years, does not mention previous publications in his CV, and is not a member of any professional associations. See Vangura Dep. 26, 29; [D.E. 70-16] 7–11 (failing to provide any publications authored by Vangura). Vangura testified that he primarily works on cases involving vehicle accidents and products liability. See Vangura Dep. 33–34. Although Vangura has served as an expert in slip, trip, and fall cases, he has never been retained to opine on the biomechanics of two people falling simultaneously. See id. at 39. Moreover, Vangura has only been retained once to provide expert testimony in a case involving police force. See id. at 42.

Plaintiffs argue that Vangura provides improper opinions about law enforcement tactics, opining "on the security of the scene, 'threat level,'" and the "necessity of the uses of force." [D.E. 80-1] 6. Vangura offers opinions that exceed his scope as a biomechanics expert and fall into the purview of an expert in law enforcement tactics and practices. In his findings, Vangura speaks to the necessity and safety of police maneuvers based on perceived resistance and interference. See

28

[D.E. 70-16] 75 ¶ 10 ("Edwards['s] use of tripping or leg sweeping was performed safely . . . ."); id. at 75 ¶ 11 ("Had Thomas not been actively resisting and pulling away, Edwards would not have needed to apply a rapid take-down technique to more effectivly [sic] control the unruly Thomas."); id. at 76 ¶ 25 ("Edwards'[s] actions during this incident are performed in as safe a manner as possible considering the level of active resistance by Thomas and Moore."). Vangura is not qualified to testify about these matters because he has no education, knowledge, training, or experience about police tactics and practices or the necessity and safety of police maneuvers.

In opposition, Defendants Edwards, Barnes, and Mizelle argue that Vangura is incorporating the testimony of John E. Combs ("Combs"), an expert they retained on law enforcement tactics and practices, into his own analysis. See [D.E. 112] 5; [D.E. 111] 6–7. The court disagrees. Vangura screenshots a single excerpt from Combs in his report about the purpose of a leg sweep. See [D.E. 70-16] 67. Vangura proceeds to draw his own conclusions on the necessity and safety of Edwards's leg sweep that are not in Combs's excerpt. Beyond that single screenshot, Vangura's remaining opinions about law enforcement tactics and practices do not mention or incorporate Combs's report. Thus, the court finds that Vangura is not qualified to opine on law enforcement tactics and practices.

Next, plaintiffs argue that Vangura is not qualified to speak on proximate cause because his testimony rests on opinions about law enforcement tactics and practices. See [D.E. 80-1] 6–7. As for Moore, Vangura concludes: "Had Moore not threatened Edwards, he woud [sic] not have struck Moore to protect himself. Moore created a dangerous condition which was a proximate cause of her injuries. Had Moore not created this dangerous condition, she would not have been injured and arrested." [D.E. 70-16] 76 ¶¶ 17–19. Vangura has only been retained as an expert in one case involving police force and has no knowledge, education, or training that qualifies him to

29

opine about the conditions Moore created, the necessity of the force Edwards used, or the proximate cause of Moore's arrest. Defendants Barnes and Mizelle argue that other courts have found Vangura qualified to testify about biomechanics, body posture and movements, and causation of injuries. See [D.E. 111] 5–6. To support this proposition, defendants cite three cases about products liability. See Hook, 2019 WL 630324; Goyal v. Thermage, Inc., No. CIV. WDQ-08-0020, 2011 WL 4380657 (D. Md. Sept. 16, 2011) (unpublished); Boring v. Cabela's, Inc., No. 08-1574, 2011 WL 43018 (W.D. Pa. Jan. 6, 2011) (unpublished). Vangura's testimony about the proximate cause of injuries in products liability cases does not qualify him to testify to proximate cause in an excessive force case, especially when his testimony goes beyond the purview of biomechanics and leads to hypotheticals about the necessity of arrests and an officer's use of force. See, e.g., Engilis, 2025 WL 2315898, at *7–10; Sardis, 10 F.4th at 288–90, 295; Zellers, 533 F. App'x at 197; Cooper, 259 F.3d at 200; Ancho, 157 F.3d at 519.

The court also finds that Vangura's report contains improper opinions on the parties' injuries. The parties agree that biomechanical experts cannot make independent medical diagnoses or offer opinions about the specific causes of an injury. See [D.E. 112] 12; [D.E. 111] 7–10; [D.E. 117] 2–3; see also Lanzetta v. Hyundai Motor Am., Inc., No. 16CV3390, 2020 WL 13660570, at *1 (D.S.C. June 29, 2020) (unpublished) (holding that the biomechanics expert cannot testify about the existence of a specific injury or otherwise diagnose an injury). Rather, most courts limit biomechanic experts to opinions about the "energy, forces, and motions involved in the incident at issue and whether the same were sufficient to have caused the type of injuries" diagnosed in the case. Ramirez, 2021 WL 1131721, at *12; see also Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007), aff'd, 300 F. App'x 700 (11th Cir. 2008) (unpublished) ("[B]iomechanical engineers typically are found to be qualified to render an opinion as to the

30

forces generated in a particular accident and the general types of injuries those forces may generate." (citations omitted)); Okanovic v. Hayes, No. 1:18-CV-957, 2019 WL 5692754, at *4 (M.D. Pa. Nov. 4, 2019) (unpublished) (same).

Here, Vangura includes findings that declare the specific cause of injuries, which Vangura cannot do. See [D.E. 70-16] 76 ¶ 22 (finding Thomas's face, head, and shoulder injuries resulted from an accidental fall); id. at 75 ¶ 5 (finding that if Thomas had not resisted down the steps, he would not have been injured). Moreover, Vangura declares the existence or absence of injuries and conditions without consulting a medical doctor or medical records. See id. at 25 ("There are no visible skin anomalies."); id. at 72 ("Photos of Edwards['s] hand injuries were observed and only the left hand exhibited any evidence of injury."[2]); id. ("Edwards appears to have a small skin laceration on the posterior aspect of his left hand."); id. at 72, 76 ¶ 12 ("There is no evidence Edwards'[s] right hand experienced any injuries indicative of throwing a punch with a closed fist during this incident."); id. at 72, 76 ¶ 13 ("Edwards'[s] hand did not experience any injuries consistent with him throwing a closed-fist punch striking Moore's face."); id. at 75 ¶ 10 (finding that Edwards's leg sweep maneuver did not cause injury). As Vangura knows, he is not qualified to offer these opinions without consulting a medical doctor and medical records. See Eggleston v. Wal-Mart Stores E., LP, No. 3:05 CV 721, 2006 WL 1050654, at *2 (E.D. Va. Apr. 20, 2006) (unpublished) (excluding Vangura's testimony because he "did not consult a medical professional to confirm his theory that [the plaintiff's] eyesight was poor at the time of the accident").

---

[2] The court notes that the only photos of Defendants Mizelle's and Edwards's injuries available to the court [D.E. 75-14] 1, capture Mizelle's hands (the left hand with an apparent injury and the right hand captured in a photo with his knee) and a single photo of Edwards's knee. It is unclear whether Vangura was opining about Mizelle's injuries or Edwards's injuries. Regardless, Vangura is not qualified to offer the opinions about the specific cause of injuries.

31

Lastly, the court finds that Vangura is not qualified to opine about whether Thomas was conscious after falling down the courthouse stairs despite consulting Thomas's medical records. See [D.E. 70-16] 75 ¶¶ 7–8. Vangura testified that Thomas was conscious based on the video evidence and medical records. Vangura notes that he reviewed the medical records, and the absence of a traumatic brain injury diagnosis means that Thomas did not lose consciousness. See Vangura Dep. 99 (testifying that he did not believe Thomas "was diagnosed with a traumatic brain injury" and "being unconscious is a traumatic brain injury"); id. at 101 (testifying that he has seen enough "medical records to see the correlation between [being unconscious and a brain injury]," which he believes is "more than just a correlation" and "actually part of the way in which doctors diagnose"). Vangura has not demonstrated that he has any knowledge, education, or training to (1) determine whether a person is conscious based on video evidence or (2) assess the relationship between loss of consciousness and a traumatic brain injury. Thus, Vangura is not qualified to opine on this topic.

Defendants have failed to prove by a preponderance of the evidence that Vangura's report and testimony are admissible. Thus, the court grants plaintiffs' motion in limine to exclude Vangura's report and testimony.

III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden,

32

the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

The record contains video recordings of the events at issue. Video evidence can affect the summary judgment standard. See Scott, 550 U.S. at 378–80; Benton v. Layton, 139 F.4th 281, 290–91 (4th Cir. 2025); Doriety ex rel. Crenshaw v. Sletten, 109 F.4th 670, 679 (4th Cir. 2024); Alexander v. Connor, 105 F.4th 174, 179 (4th Cir. 2024); Brooks v. Johnson, 924 F.3d 104, 114–15 (4th Cir. 2019). Where the video contradicts the nonmoving party's version of the facts, such that no reasonable jury could believe the nonmoving party, the court must view the facts in the light depicted by the video. See Scott, 550 U.S. at 380–81; Benton, 139 F.4th at 290–91; Alexander, 105 F.4th at 179; Lewis v. Caraballo, 98 F.4th 521, 529–30 (4th Cir. 2024). Where the video, however, does not record the alleged specific conduct at issue, the video does not affect

33

the court's summary judgment analysis. See Scott, 550 U.S. at 380–81; Benton, 139 F.4th at 290–91; Alexander, 105 F.4th at 179; Lewis, 98 F.4th at 529–30.

A.

Defendants Edwards and Mizelle seek summary judgment on plaintiffs' malicious prosecution claims (count eleven: section 1983) (count fourteen: common law), and state-law false imprisonment claim (count twelve). Defendants Edwards and Mizelle argue that the existence of probable cause defeats each of these claims. The court agrees.

"To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." District of Columbia v. Wesby, 583 U.S. 48, 56–57 (2018) (citation omitted); see Pringle, 540 U.S. at 371; Ornelas v. United States, 517 U.S. 690, 696 (1996); Beck v. Ohio, 379 U.S. 89, 91 (1964); Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003); State v. Jackson, 262 N.C. App. 329, 335, 821 S.E.2d 656, 662 (2018). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." Wesby, 583 U.S. at 57 (quotations and citation omitted); see Pringle, 540 U.S. at 371; Illinois v. Gates, 462 U.S. 213, 241–46 (1983); United States v. Dickey-Bey, 393 F.3d 449, 454 (4th Cir. 2004); State v. Benters, 367 N.C. 660, 664, 766 S.E.2d 593, 597 (2014). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Pringle, 540 U.S. at 370 (cleaned up); Ornelas, 517 U.S. at 695; Benters, 367 N.C. at 664–65, 766 S.E.2d at 598. In evaluating objective reasonableness, what the police officer observed is highly relevant; the police officer's subjective beliefs are not. See, e.g., Devenpeck v. Alford, 543 U.S.

34

146, 153 (2004). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Wesby, 583 U.S. at 57 (quotation omitted); Gates, 462 U.S. at 243–44, 243 n.13; Benters, 367 N.C. at 664–65, 766 S.E.2d at 598. "Probable cause is not a high bar." Wesby, 583 U.S. at 57 (quotation omitted).

1.

Thomas and Moore brought a Fourth Amendment claim under section 1983 for malicious prosecution against Edwards and Mizelle. Although Thomas does not bring a claim for unreasonable seizure, the analysis for malicious prosecution and false imprisonment are anchored in the existence of an unreasonable seizure. Thomas claims that because he was unreasonably seized, he meets the requirements for malicious prosecution and false imprisonment. See [D.E. 97] 24–25. Thus, the court initially examines whether Thomas's seizure violated the Fourth Amendment.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. An investigatory stop, otherwise known as a Terry stop, and an arrest are seizures. See Terry v. Ohio, 392 U.S. 1, 16 (1968). An officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Id. at 30; Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion is a lower bar than probable cause. Whether there is reasonable suspicion depends on the totality of the circumstances, including information known to the officer and any reasonable inferences to be drawn at the time of the stop. See United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Foster, 824 F.3d 84, 89 (4th Cir. 2016). "This process allows officers to draw on their own experience and specialized

35

training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 534 U.S. at 273 (quotations and citation omitted); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). So long as the officer has reasonable suspicion to stop the individual for any offense, the officer's subjective motivation for the traffic stop is irrelevant. See Ohio v. Robinette, 519 U.S. 33, 38 (1996); Whren v. United States, 517 U.S. 806, 813 (1996); United States v. McDonald, 61 F.3d 248, 254 (4th Cir. 1995), overruled in part on other grounds by United States v. Wilson, 205 F.3d 720 (4th Cir. 2000); United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993).

If the officer has probable cause to make a Terry stop or garners probable cause during the stop, the officer can make a warrantless arrest. Warrantless arrests are permitted when the officer has probable cause that a felony has been committed by the arrested individual, or the arrested individual commits a misdemeanor in the officer's presence. See Virginia v. Moore, 553 U.S. 164, 176–78 (2008) (arresting individual for driving on suspended license did not violate Fourth Amendment, even though state law required issuance of summons and did not authorize arrest); Devenpeck, 543 U.S. at 152; Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); see also United States v. McNeill, 484 F.3d 301, 312 (4th Cir. 2007).

Edwards had reasonable suspicion when he stopped Thomas on US Highway 64. In fact, Edwards had probable cause to believe that Thomas was exceeding the posted speed limit after Edwards paced the Nissan going over 100 miles per hour in a 50-mile per hour zone. Thomas does not dispute that Edwards paced him at this speed. Instead, Thomas argues that Edwards was not trained to use a radar gun. So what. That is not the method Edwards used to estimate Thomas's

36

speed. Thomas also argues that this was a pretextual stop. Even if true, however, Edwards's subjective intent for stopping Thomas is irrelevant. See, e.g., Whren, 517 U.S. at 813. Because Edwards witnessed Thomas's speeding, Edwards had probable cause to stop Thomas and arrest him. See, e.g., Atwater, 532 U.S. at 354.

In opposition, Thomas cites United States v. Sowards, 690 F.3d 583, 592 (4th Cir. 2012), and argues that Edwards needed an "indicia of reliability to support probable cause" for speeding. See [D.E. 97] 8–11. In Sowards, Sowards was traveling 75 miles per hour in a 70-mile per hour zone. See id. at 585. The officer did not have a radar, did not pace Sowards, and merely estimated Soward's speed with his eyes. See id. The Fourth Circuit held that when a vehicle is traveling in "slight" excess of the speed limit, the reasonableness of the officer's estimate needs support from "radar, pacing methods, or other indicia of reliability." Id. at 592 (emphasis added). Unlike Soward, Thomas was traveling 100 miles per hour in a 50-mile per hour zone, and Edwards used pacing, not a visual estimate, to determine Thomas's speed. Thus, this argument fails. Edwards did not violate the Fourth Amendment and unreasonably seize Thomas when he stopped and arrested Thomas.

As for plaintiffs' section 1983 malicious prosecution claim, Edwards had probable cause to charge Thomas and Moore with each violation. A Fourth Amendment claim under section 1983 for malicious prosecution requires a plaintiff to show (1) the wrongful initiation of charges without probable cause and (2) the termination of the underlying prosecution in plaintiff's favor. See Thompson v. Clark, 596 U.S. 36, 43–44 (2022); Thurston v. Frye, 99 F.4th 665, 673 (4th Cir. 2024); Massey v. Ojaniit, 759 F.3d 343, 356 (4th Cir. 2016). Even if these two elements are satisfied, a plaintiff also must show that the claim that lacks probable cause caused the unreasonable seizure. See Chiaverini v. City of Napoleon, Ohio, 602 U.S. 556, 564 (2024) ("[A]

37

Fourth Amendment malicious-prosecution suit depends not just on an unsupported charge, but on that charge's causing a seizure."). The existence of probable cause necessarily defeats a claim for malicious prosecution under the Fourth Amendment. See Thompson, 596 U.S. at 43 ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause."). But the Supreme Court has held that all charges brought against the plaintiff must be supported by probable cause to categorically defeat a Fourth Amendment malicious prosecution claim. See Chiaverini, 602 U.S. at 562–64 (holding that "the bringing of one valid charge in a criminal proceeding" does not categorically preclude a malicious prosecution claim under the Fourth Amendment if the valid charge is accompanied by charges not supported by probable cause).

After an officer arrests an individual, a magistrate's subsequent finding of probable cause weighs heavily toward finding that the officer was objectively reasonable to believe probable cause existed for the charged offense. See Hupp v. Cook, 931 F.3d 307, 324 (4th Cir. 2019). If the probable cause finding by the magistrate rested on false statements, however, then this significantly undermines whether a "reasonable officer" would have believed that probable cause existed for the arrest. See id. In their complaint, Thomas and Moore stated that the probable cause findings by the magistrate rested on Edwards's false statements. See [D.E. 1] ¶ 413. But plaintiffs' briefs and statements of material fact fail to discuss this issue, offer evidence, or cite to alleged false statements. Thus, the magistrate's finding of probable cause to charge Thomas and Moore with every violation Edwards suggested supports Edwards's reasonableness in arresting Thomas and Moore for these violations. See, e.g., Hupp, 931 F.3d at 324.

As for Moore, Edwards arrested her for RDO under N.C. Gen. Stat. § 14-223. Under section 14-223, "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public

38

officer in discharging or attempting to discharge an official duty, the person is guilty of a Class 2 misdemeanor." Id. The elements of the offense are:

1) that the victim was a public officer;

2) that the [arrestee] knew or had reasonable grounds to believe that the victim was a public officer;

3) that the victim was discharging or attempting to discharge a duty of his office;

4) that the [arrestee] resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and

5) that the [arrestee] acted willfully and unlawfully, that is intentionally and without justification or excuse.

State v. Sinclair, 191 N.C. App. 485, 488–89, 663 S.E.2d 866, 870 (2008). Section 14-223 seeks "to enforce orderly conduct in the important mission of preserving the peace . . . and upholding the dignity of the law." State v. Leigh, 278 N.C. 243, 251, 179 S.E.2d 708, 713 (1971). The statute concerns "acts threatening a public officer with injury only insofar as they interfere with the performance of his official duties." State v. Hardy, 298 N.C. 191, 197, 257 S.E.2d 426, 430 (1979).

"[M]erely remonstrating with an officer . . . or criticizing or questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties." Leigh, 278 N.C. at 251, 179 S.E.2d at 713; see State v. Singletary, 73 N.C. App. 612, 615, 327 S.E.2d 11, 13 (1985); State v. Allen, 14 N.C. App. 485, 491, 188 S.E.2d 568, 573 (1972). Section 14-223 does not apply to "communications simply intended to assert rights, seek clarification or obtain information in a peaceful way." Burton v. City of Durham, 118 N.C. App. 676, 681, 457 S.E.2d 329, 332 (1995). But the statute does apply if the individual refuses commands and verbally harasses an officer if the individual's conduct disrupts the officer's duties. See State v. Bell, 164 N.C. App. 83, 85–86, 594 S.E.2d 824, 825–26 (2004); see, e.g., Craddock v. Beaufort Cnty. Sheriff Dep't, No. 4:09-CV-92, 2011 WL

39

4460309, at *8 (E.D.N.C. Sept. 26, 2011) (unpublished), aff'd sub nom., Craddock v. Beaufort Cnty. Sheriffs Dep't, 489 F. App'x 712 (4th Cir. 2012) (per curiam) (unpublished). An individual need not engage in physical violence or permanently impede an officer's duties in order to violate N.C. Gen. Stat. § 14-223. See State v. Burton, 108 N.C. App. 219, 225, 423 S.E.2d 484, 488 (1992).

Moore argues that there was no probable cause to arrest her for RDO because she was only recording, a protected activity under the First Amendment. See [D.E. 97] 19. Even viewing the evidence in the light most favorable to Moore, the video evidence shows that Edwards had probable cause to arrest Moore for RDO. When Moore and Gilliam arrived at WCC, Edwards approached Moore and said, "You can stay right there, or I will take you to jail too." See EBWC 00:39:10–00:39:13; DESMF ¶ 88. Moore knew Edwards was a public officer. He was wearing his uniform and transporting her handcuffed nephew to the courthouse jail. Moore refused Edwards's command and did not stay where she was. Instead, Moore and Gilliam approached Edwards and Mizelle while Thomas was on the ground. See EBWC 00:39:17–00:39:26. Mizelle told Moore to "stay back," and she retreated slightly while Gilliam stood beside the officers yelling. See MBWC 00:02:53–00:03:02. When Edwards started dragging Thomas across the asphalt to get him inside, Moore again approached Edwards with her phone extended until she was within an arms-length distance. At that point, Edwards stopped transporting Thomas and struck Moore in the face before placing her under arrest for RDO. Moore refusing Edwards's and Mizelle's clear commands to stay back and approaching Edwards within an arms-length distance meant Edwards had to abandon transporting Thomas inside and divert his attention to Moore's approach. This delayed the discharge of Edwards's duty to transport an arrestee to the county jail.

40

Moore responds that filming a police officer in public is protected First Amendment activity. See Sharpe v. Winterville Police Dep't, 59 F.4th 674, 681 (4th Cir. 2023), cert. denied, 144 S. Ct. 488 (2023), and cert. denied, 144 S. Ct. 489 (2023). Moore, however, was not charged with RDO for filming the encounter. Moore was charged with RDO for refusing commands and approaching Edwards with her hand extended while he was transporting Thomas. Even viewing the evidence in the light most favorable to Moore, Edwards had probable cause to arrest Moore for violating section 14-223, necessarily defeating Moore's malicious prosecution claim. See, e.g., Chiaverini, 602 U.S. at 562–64; Thompson, 596 U.S. at 43. Thus, the court grants summary judgment to Edwards and Mizelle for Moore's section 1983 malicious prosecution claim.

As for Thomas, the court examines each charge brought against Thomas beyond speeding and decides whether Edwards had probable cause to charge Thomas with each crime. Chiaverini, 602 U.S. at 562–64. First, Edwards was charged with careless and reckless driving. Under N.C. Gen. Stat. § 20-140(b), "[a]ny person who drives any vehicle upon a highway or any public vehicular area without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property shall be guilty of reckless driving." Under this statute, North Carolina courts focus primarily on the speed and manner of the driving. State v. Teel, 180 N.C. App. 446, 450, 637 S.E.2d 288, 291 (2006) (affirming the denial of a motion to dismiss for a reckless driving charge because the defendant was traveling 90 miles per hour in a 45-mile per hour zone and crossing the center line); accord State v. Newkirk, No. COA18-670, 2019 WL 1749407, at *2 (N.C. Ct. App. Apr. 16, 2019) (unpublished) (holding that the defendant's actions "clearly constituted reckless driving under N.C. Gen. Stat. § 20-140(b)" when he accelerated to speeds exceeding 100 miles per hour in a 55-mile per hour zone and crossed a center line). For example, when an individual travels 40 miles per hour above the speed limit and is

41

impaired, the individual violates section 20-140(b). See State v. Coffey, 189 N.C. App. 382, 387, 658 S.E.2d 73, 77 (2008) (holding the defendant violated N.C. Gen. Stat. § 20-140(b) by driving impaired and traveling 92 miles per hour in a 45-mile per hour zone). The facts, taken in the light most favorable to Thomas, show that Thomas was traveling down US Highway 64. Edwards saw Thomas pass him at what he believed to be a high rate of speed. He followed Thomas and paced him going over 100 miles per hour in a 50-mile per hour zone. Once Edwards stopped Thomas, Edwards smelled what he believed to be marijuana and asked Thomas if he was high. See EBWC 00:01:43–00:01:45. Thomas does not dispute that Edwards thought he smelled marijuana but rather argues that it was hemp. It does not matter, however, if it was hemp. A reasonable officer who paces a car going 50 miles per hour above the posted speed limit and believes an individual may be under the influence has probable cause to charge that individual with reckless driving under N.C. Gen. Stat. § 20-140(b). See, e.g., Coffey, 189 N.C. App. at 387, 658 S.E.2d at 77. Thus, even viewing the evidence in the light most favorable to Thomas, Edwards had probable cause to charge Thomas under N.C. Gen. Stat. § 20-140(b).

Second, Edwards was charged with driving with a revoked license under N.C. Gen. Stat. § 20-28(a1). Section 20-28(a1) states that "[a]ny person whose drivers license has been revoked for an impaired driving revocation as defined in G.S. 20-28.2(a) and who drives any motor vehicle upon the highways of the State is guilty of a Class 1 misdemeanor." The parties agree that Thomas's license was revoked as defined in G.S. 20-28.2(a) and that he was driving his Nissan on US Highway 64. Moreover, when Edwards stopped Thomas, Edwards conducted a license check and discovered Thomas's license was revoked. Edwards then confirmed this information with dispatch outside the courthouse. Thomas responds that Edwards did not verify the status of his license through Criminal Justice Law Enforcement Automated Data Services ("CJLEADS"). See

42

[D.E. 97] 10. It does not matter. Edwards verified the license revocation himself and through dispatch. See DESMF ¶ 29; PSMFE ¶ 29. Thus, Edwards had probable cause to charge Thomas with driving with a revoked license under N.C. Gen. Stat. § 20-28(a1).

Third, Edwards was charged with possession with intent to sell and deliver under N.C. Gen. Stat. § 90-95(a)(1). To prove a defendant has committed the offense under section 90-95(a)(1), the State must prove defendant's (1) possession; (2) of a controlled substance; (3) with intent to sell or deliver the controlled substance. See State v. Blagg, 377 N.C. 482, 489, 858 S.E.2d 268, 274 (2021). Marijuana is a Schedule VI controlled substance under section 90-95. See N.C. Gen. Stat. § 90-95(d)(4). Whether the evidence supports a charge for intent to distribute is a "fact-specific inquiry in which the totality of the circumstances in each case must be considered." State v. Coley, 257 N.C. App. 780, 788, 810 S.E.2d 359, 365 (2018). Intent to sell or deliver "may be inferred from (1) the packaging, labeling, and storage of the controlled substance, (2) the defendant's activities, (3) the quantity found, and (4) the presence of cash or drug paraphernalia." See id. at 786, 789, 810 S.E.2d at 363, 365 (finding sufficient evidence to submit the case to the jury for intent to distribute where the vehicle contained 11.5 grams of marijuana in two sandwich bags, a digital scale, cigar wrappers, and a number of sandwich bags); State v. Yisrael, 255 N.C. App. 184, 189–92, 804 S.E.2d 742, 745–47 (2017), aff'd, 371 N.C. 108, 813 S.E.2d 217 (2018) (finding sufficient evidence to submit the case to the jury for intent to distribute when the defendant possessed 10.88 grams of marijuana packaged in three separate bags, over $1,000 in cash, and a handgun). Additionally, on March 2, 2022, even if the substance believed to be marijuana turned out to be an indistinguishable legal substance, such as hemp, the officer's probable cause to charge the defendant with a crime remained. See State v. Little, 295 N.C. App. 541, 553, 905 S.E.2d 907, 916 (2024) (holding that the smell and appearance of marijuana and hemp are hard to distinguish

43

and affirming the trial court's holding that based on the "totality of the circumstances," the officers still had probable cause to search the vehicle after they saw and smelled what they believed to be marijuana); State v. Johnson, 288 N.C. App. 441, 457–58, 886 S.E.2d 620, 632 (2023) (explaining that the "smell of marijuana alone supports a determination of probable cause, even if some use of industrial hemp products is legal under North Carolina law. . . . because only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause" (cleaned up)).[3] Furthermore, the officers have no reason to believe the substance is anything other than marijuana if the individual does not tell the officers that it is hemp. See Little, 295 N.C. App. at 552–53, 905 S.E.2d at 915–16 (noting that the officers had no reason to believe the substance was hemp if the defendant himself did not state that it was hemp when asked about the marijuana smell).

Viewing the evidence in the light most favorable to Thomas, Edwards had probable cause to charge Thomas with possession with intent to sell and deliver under N.C. Gen. Stat. § 90-95(a)(1). Edwards confiscated from Thomas's vehicle 1.22 ounces, or approximately 35 grams, of alleged marijuana packaged in three separate bags, cigar papers, and a partially smoked blunt. Edwards also found $1,100 in cash on Thomas. Based on the quantity of suspected drugs packaged

---

[3] In March 2025, the Supreme Court of North Carolina granted review in three separate cases on whether the smell of marijuana alone suffices to support probable cause after the legalization of hemp. See State v. Schiene, 387 N.C. 422, 912 S.E.2d 378 (2025); State v. Dobson, 387 N.C. 420, 912 S.E.2d 374 (2025); State v. Rowdy, 387 N.C. 421, 912 S.E.2d 379 (2025). On September 9, 2025, the Supreme Court of North Carolina heard oral arguments in these cases. Even if the Supreme Court of North Carolina adopts a "totality of the circumstances" approach and holds that the smell of marijuana alone does not suffice (i.e., the approach affirmed by the North Carolina Court of Appeals in Little, 295 N.C. App. at 552–53, 905 S.E.2d at 915–16), Edwards did not rely on the smell of marijuana alone. Edwards pulled Thomas over for speeding at 100 miles per hour and smelled what he believed to be marijuana. Edwards then asked Goddard where the marijuana was located, and Goddard responded that "it" was under "his seat." Only then did Edwards search the vehicle and discover alleged marijuana in three separate bags, cigar papers, and a partially smoked blunt. Based on the totality of the circumstances, Edwards had probable cause to believe the substance was marijuana.

44

in separate bags, the large sum of cash, and the drug paraphernalia, Edwards had probable cause to charge Thomas with possession with intent to sell and deliver under N.C. Gen. Stat. § 90-95(a)(1). See, e.g., Coley, 257 N.C. App. at 786, 789, 810 S.E.2d at 363, 365; Yisrael, 255 N.C. App. at 189–92, 804 S.E.2d at 745–47. The magistrate's finding that there was probable cause to charge Thomas with this crime also supports the reasonableness of Edwards's belief. See, e.g., Hupp, 931 F.3d at 324.

Even if the substance confiscated from Thomas's vehicle was hemp, not marijuana, probable cause remains. After the district attorney dropped the charges, the substances confiscated were never tested and confirmed to be marijuana. Whether the substance was hemp or marijuana does not impact whether Edwards had probable cause. Notably, Thomas never told Edwards the substance was hemp. Cf. Little, 295 N.C. App. at 553, 905 S.E.2d at 916. Moreover, Edwards did not have the ability to test the substance. In fact, Thomas admits that Edwards was not trained to distinguish the difference between the two substances. See PSMFE ¶ 10. Furthermore, probable cause requires only the probability, and not a prima facie showing, of criminal activity. See, e.g., Wesby, 583 U.S. at 57; Gates, 462 U.S. at 243–44, 243 n.13; Benters, 367 N.C. at 664–65, 766 S.E.2d at 598; Johnson, 288 N.C. App. at 457–58, 886 S.E.2d at 632. Thus, even construing the evidence in the light most favorable to Thomas, Edwards had probable cause to charge Thomas with intent to sell and deliver under N.C. Gen. Stat. § 90-95(a)(1).

Lastly, Thomas was charged with possession of drug paraphernalia under N.C. Gen. Stat. § 90-113.22A(a). Under section 90-113.22A(a), "it is unlawful for any person to knowingly use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, package, repackage, store, contain, or conceal marijuana or to inject, ingest, inhale, or otherwise introduce marijuana

45

into the body." Id. "Drug paraphernalia" means "all equipment, products and materials of any kind that are used to facilitate, or intended or designed to facilitate, violations of the Controlled Substances Act, including planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, and concealing controlled substances and injecting, ingesting, inhaling, or otherwise introducing controlled substances into the human body." Id. § 90-113.21(a). When determining whether an object is drug paraphernalia, "all relevant evidence" and the following selected factors can be considered: (1) "[p]rior convictions of the owner or other person in control of the object for violations of controlled substances law;" (2) "[t]he proximity of the object to a controlled substance;" and (3) "[t]he existence of any residue of a controlled substance on the object." Id. § 90-113.21(b)(2), (4)–(5). Here, Edwards found 1.22 ounces of suspected marijuana packaged in three separate bags, cigar papers in the center console, and a partially smoked blunt under the driver's seat. These items, including the bags and the cigar paper, are used to store and ingest marijuana. See id. § 90-113.21(a). Additionally, Edwards discovered Thomas had prior narcotics charges. See id. § 90-113.21(b)(2). Thus, even viewing the evidence in the light most favorable to Thomas, Edwards had probable cause to charge Thomas with possession of drug paraphernalia under N.C. Gen. Stat. § 90-113.22A(a).

2.

Mizelle and Edwards also move for summary judgment on state law claims for malicious prosecution (count fourteen: Thomas and Moore against Edwards) and false imprisonment (count twelve: Thomas against Edwards). Both claims fail for the same reasons as their federal counterparts.

46

North Carolina law applies to plaintiffs' common law malicious prosecution and false imprisonment claims. For those claims, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). First, the court looks to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation and citation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks ex rel. Feiock v. Feiock, 485 U.S. 624, 630 & n.8 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

As for malicious prosecution under North Carolina law, a plaintiff must establish four elements: "(1) the defendant initiated the earlier proceeding; (2) malice on the part of the defendant in doing so; (3) lack of probable cause for the initiation of the earlier proceeding; and (4) termination of the earlier proceeding in favor of the plaintiff." Adams v. City of Raleigh, 245 N.C. App. 330, 335, 782 S.E.2d 108, 112–13 (2016). The existence of probable cause defeats a plaintiff's claim for malicious prosecution. See Turner v. Thomas, 369 N.C. 419, 425, 794 S.E.2d

47

439, 444 (2016); Adams, 245 N.C. App. at 335, 782 S.E.2d at 112–13. As discussed, probable cause existed for each crime with which Moore and Thomas were charged. Thus, there is not a genuine issue of material fact, and the court grants summary judgment on the malicious prosecution claims.

Under North Carolina law, false imprisonment is "the illegal restraint of a person against [the person's] will." Hemric v. Groce, 169 N.C. App. 69, 78, 609 S.E.2d 276, 283 (2005) (quotation omitted); see Fowler v. Valencourt, 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993); Black v. Clark's Greensboro, Inc., 263 N.C. 226, 228, 139 S.E.2d 199, 201 (1964); Hales v. McCrory-McLellan Corp., 260 N.C. 568, 570, 133 S.E.2d 225, 227 (1963); Adams, 245 N.C. App. at 334, 782 S.E.2d at 112; Wilkerson v. Duke Univ., 229 N.C. App. 670, 674, 748 S.E.2d 154, 158 (2013); see also Shinaberry v. Town of Murfreesboro, No. 2:17-CV-7, 2019 WL 5446712, at *8 (E.D.N.C. Oct. 23, 2019) (unpublished). To establish a false imprisonment claim, a plaintiff must prove "(1) the illegal restraint of plaintiff by defendant; (2) by force or threat of force; and (3) against the plaintiff's will." Cherry v. United Parcel Serv., Inc., No. 5:07-CV-403, 2009 WL 8641019, at *12 (E.D.N.C. Sept. 28, 2009) (unpublished) (quotation omitted), aff'd, 402 F. App'x 764 (4th Cir. 2010) (per curiam) (unpublished); see Kling v. Harris Teeter Inc., 338 F. Supp. 2d 667, 679 (W.D.N.C. 2002), aff'd, 86 F. App'x 662 (4th Cir. 2004) (per curiam) (unpublished); Wilkerson, 229 N.C. App. at 674, 748 S.E.2d at 158. "While actual force is not required, there must be an implied threat of force which compels a person to remain where [s]he does not wish to remain or go where [s]he does not wish to go." West v. King's Dep't Store, Inc., 321 N.C. 698, 702, 365 S.E.2d 621, 623–24 (1988). One means of establishing unlawfulness is showing that an officer made a warrantless arrest without probable cause, triggering a claim for false arrest. See Glenn-Robinson v. Acker, 140 N.C. App. 606, 625, 538 S.E.2d 601, 615 (2000); Adams, 245 N.C.

48

App. at 334, 782 S.E.2d at 112. "Probable cause is an absolute bar to a claim for false arrest." Adams, 245 N.C. App. at 335, 782 S.E.2d at 112 (citation omitted). As discussed, Edwards had probable cause to arrest Thomas. Thus, Thomas has no false imprisonment claim under North Carolina law, and the court grants Edwards's motion for summary judgment on this claim.

B.

Edwards and Mizelle move for summary judgment on the Fourth Amendment claims for excessive force brought under section 1983. Moore sued Edwards in his individual capacity (count two) and Thomas sued Mizelle and Edwards in their individual capacity (count one).

The Fourth Amendment protects citizens from excessive force during arrest. See, e.g., Graham v. Connor, 490 U.S. 386, 394–95 (1989); Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009); Young v. Prince George's Cnty., 355 F.3d 751, 758 (4th Cir. 2004); Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). To determine whether an officer's use of force was excessive, the court employs a "reasonableness" test. See, e.g., Graham, 490 U.S. at 396; Valladares, 552 F.3d at 388. The court examines the objective reasonableness of the officer's actions, rather than the subjective motivations of the officer. See, e.g., Graham, 490 U.S. at 397; Young, 355 F.3d at 756–57; Jones, 325 F.3d at 527.

The reasonableness test under the Fourth Amendment is not "capable of precise definition" or mechanical application. Bell v. Wolfish, 441 U.S. 520, 559 (1979). The court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009) (citation omitted); Young, 355 F.3d at 757. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

49

necessary in a particular situation." Graham, 490 U.S. at 396–97. The court must carefully examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. The court also may consider the extent of the plaintiff's injury. See Jones, 325 F.3d at 527. In evaluating these factors, the court must not engage in Monday-morning quarterbacking, but instead must assess the reasonableness of the officer's actions based on the totality of the circumstances, "including facts and events leading up to the climactic moment." Barnes v. Felix, 605 U.S. 73, 76 (2025); Benton, 139 F.4th at 289–90; see Graham, 490 U.S. at 396–97; Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019) (quotation omitted); Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005); Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 613 (E.D.N.C. 2009).

The doctrine of qualified immunity applies to officers when sued under section 1983 in their individual capacity. See Wesby, 583 U.S. at 62 n.7; Camreta v. Greene, 563 U.S. 692, 707 (2011); Pearson v. Callahan, 555 U.S. 223, 236 (2009); King v. Riley, 76 F.4th 259, 265 (4th Cir. 2023). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see City of Escondido v. Emmons, 586 U.S. 38, 42 (2019) (per curiam); Kisela v. Hughes, 584 U.S. 100, 103 (2018) (per curiam); Wesby, 583 U.S. at 63; Hernandez v. Mesa, 582 U.S. 548, 554 (2017); Ziglar v. Abbasi, 582 U.S. 120, 150–51 (2017); King, 76 F.4th at 266–68; Sharpe, 59 F.4th at 682–84; Burns-Fisher v. Romero-Lehrer, 57 F.4th 421, 424 (4th Cir. 2023); Tobey v. Jones, 706 F.3d 379, 385 (4th Cir.

2013). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 138 S. Ct. at 1152.

In analyzing qualified immunity, the court asks (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson, 555 U.S. at 232 (citations omitted); see Wood v. Moss, 572 U.S. 744, 757 (2014); Knibbs v. Momphard, 30 F.4th 200, 214 (4th Cir. 2022); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (cleaned up); see Rivas-Villegas v. Cortesluna, 595 U.S. 1 (2021) (per curiam); King, 76 F.4th at 265; Sharpe, 59 F.4th at 682–84. Although a case need not be directly controlling, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Rivas-Villegas, 142 S. Ct. at 7–8; King, 76 F.4th at 266–68; Sharpe, 59 F.4th at 682–84.

To determine whether an officer's conduct violates clearly established law, a court must first specifically define the right. See, e.g., City of Tahlequah v. Bond, 595 U.S. 9 (2021) (per curiam). "Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Id. (quotations omitted). Then, based on that specifically defined right, the court must determine whether existing precedent placed the statutory or constitutional question "beyond debate." Kisela, 138 S. Ct. at 1152. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well

51

defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Bond, 142 S. Ct. at 11 (quotation omitted); Wesby, 583 U.S. at 63. An officer is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 138 S. Ct. at 1152 (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)); Wesby, 583 U.S. at 63–66.

The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." Wesby, 583 U.S. at 66 n.8; see Kisela, 138 S. Ct. at 1152–54; Taylor v. Barkes, 575 U.S. 822, 825–27 (2015) (per curiam); City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 613–14 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam). In the Fourth Circuit, "existing precedent" includes precedent of the United States Supreme Court, the Fourth Circuit, and the highest court of the state in which the action arose. See Doe ex rel. Johnson, 597 F.3d at 176. It also includes "a consensus of persuasive authority from other jurisdictions." Sharpe, 59 F.4th at 683.

In Pearson, the Supreme Court held that the qualified-immunity analysis need not proceed in a particular sequence, and that "[t]he judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236; King, 76 F.4th at 265. Qualified immunity shields a defendant if the answer to either prong is "no." See al-Kidd, 563 U.S. at 735; Miller, 475 F.3d at 627; Bostic, 667 F. Supp. 2d at 605–06.

Thomas and Moore argue that their arrests were unreasonable seizures because the officers lacked probable cause, and therefore, any use of force by Edwards or Mizelle was "excessive." See [D.E. 97] 8–11, 17–19. The court rejects this argument for both plaintiffs. As discussed,

52

Edwards had probable cause to arrest both Thomas and Moore. Thus, the seizure of Thomas and Moore was reasonable, and the court rejects this argument.

1.

Turning next to alleged uses of force, Moore argues there are seven instances of excessive force. See [D.E. 97] 19–20. But the uses of force that Moore identifies are duplicative and overstated based on the body camera footage. At bottom, Moore identifies three instances of force: (1) Edwards striking Moore in the face when Moore approached him; (2) Edwards pushing Moore on the ground and forcing her to lay down using his knees when arresting her; and (3) Edwards grabbing Moore by the hoodie and pushing her neck to get her into the courthouse.

Initially, the court notes that the misdemeanant status of both Moore and Thomas does not favor the use of force. But this fact is only one of several considerations. Thus, the court considers the misdemeanant status of the crime while addressing the other factors.

As for the strike to the face, Moore argues that because the parties dispute whether Edwards struck her with an open palm or a closed fist, the court cannot grant summary judgment on this claim. See id. at 20. The court disagrees. Even assuming Edwards punched Moore with a closed fist, his application of force was objectively reasonable given Moore's conduct. Moore and Gilliam arrived at WCC while Edwards and Mizelle were trying to transport Thomas to the jail. Edwards told Moore to stay where she was, and she refused to comply. See EBWC 00:39:09–00:39:13; DESMF ¶ 88. Moore and Gilliam walked up to Mizelle and Edwards yelling expletives. See MBWC 00:02:50–00:03:22. Once Edwards started dragging Thomas, Moore approached him with her arm extended and got within an arms-length distance. See id. at 00:03:25–00:03:27. Edwards had both his hands occupied with a resisting Thomas, rendering him defenseless. Edwards acted reasonably in releasing Thomas and defending himself against Moore. Two

53

seconds elapsed between when Moore approached Edwards and when Edwards struck her.  See MBWC 00:03:25–00:03:27.  Moore fell to the ground with a bleeding and swollen mouth but immediately stood up and retreated to her vehicle.  See MBWC 00:03:28–00:03:30; DESMF ¶ 111; PSMFE ¶ 111; DMBSMF ¶ 113; PSMFBM ¶ 113.  In an attempt to paint herself as non-threatening, Moore characterizes herself as "elderly."  See [D.E. 93] 1, 20; [D.E. 97] 2, 15, 19.  But the video shows that Moore was similar in stature to Edwards and physically capable of approaching Edwards in stride.  Edwards had to make a "split-second" decision in a "tense" and "rapidly evolving" situation to apply force to Moore and temporarily subdue her from advancing on him further.  Graham, 490 U.S. at 396–97; Park, 250 F.3d at 853.  Viewing the evidence in the light most favorable to Moore while also considering the undisputed video evidence, the force Edwards used to strike Moore in the face was objectively reasonable.

Alternatively, even if the force was excessive, Edwards still has qualified immunity based on a lack of clearly established law.  The Fourth Circuit has held that punches were excessive when applied to a suspect who was handcuffed, compliant, and no longer resisting.  See Thomas v. Holly, 533 F. App'x 208, 218 (4th Cir. 2013) (per curiam) (unpublished); Jones, 325 F.3d at 523–25, 528–30.  But the Fourth Circuit has not addressed the use of a closed-fist punch when the suspect is not detained and actively approaching an officer.  In fact, various other circuits that have addressed the issue have all concluded that a closed-fist punch on an unsecured, resisting suspect does not constitute excessive force.  See, e.g., Brax v. City of Grand Rapids, Mich., 742 F. App'x 952, 956–57 (6th Cir. 2018) (unpublished); Conklin v. Hale, 680 F. App'x 120, 123 (3d Cir. 2017) (per curiam) (unpublished); Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1351, 1355 (11th Cir. 2015) (per curiam); Husbands ex rel. Forde v. City of New York, 335 F. App'x 124, 128–29 (2d Cir. 2009) (per curiam) (unpublished); Winters v. Adams, 254 F.3d 758, 764–66 (8th Cir.

2001). Thus, the court grants Edwards's motion for summary judgment on the excessive force claim regarding the strike to Moore's face.

As for the force used to arrest Moore, Edwards's use of force to get Moore on the ground and keep her on the ground was objectively reasonable based on Moore's resistance. After Moore approached Edwards and was struck, she retreated towards her car. Edwards, who intended to arrest her for RDO, followed her. Compare DMBSMF ¶ 115, with PSMFBM ¶ 115. He grabbed her arm, and she pulled away from him, actively resisting his attempt to handcuff her. See MEC 00:31:19–00:31:23. Edwards then employed a takedown maneuver to get Moore on the ground. Once on the ground, Moore continued resisting against Edwards; therefore, Edwards used his knees to force Moore back on the ground and placed her in handcuffs. See id. at 00:31:30–00:31:35. At some point during the struggle with Edwards, Moore broke her finger. See [D.E. 1] 32. Edwards reasonably believed Moore posed a threat to him and the other officers. Moore already had engaged in threatening behavior by approaching to within an arms-length of Edwards with her arms extended while he was defenseless. Furthermore, Edwards was trying to arrest Moore without applying force, but she actively resisted. Once Edwards had Moore on the ground, Moore fought with him for nearly ten seconds, refusing to stay on the ground and pushing up against him. See MEC 00:31:25–00:31:34. Considering Moore's active resistance, Moore's injuries were mild.

Various courts have held that officers, who used far more force than Edwards, were objectively reasonable in their application of force when a suspect was resisting but already handcuffed and secured. See, e.g., Craig v. Martin, 49 F.4th 404, 411–12 (5th Cir. 2022) (holding that a police officer who took a resisting handcuffed suspect to the ground and then stood up and kicked her in the leg in order to put her into a police car did not use excessive force); Mason v.

55

<u>Las Vegas Metro. Police Dep't</u>, 754 F. App'x 559, 562 (9th Cir. 2019) (per curiam) (unpublished) (holding that an officer's use of force against a handcuffed suspect who resisted arrest did not constitute excessive force where the detainee allegedly attempted to head-butt and kick the officer and the officer responded by pushing the detainee down on a table with such force that her face broke the glass on the table and injured her face and mouth); <u>Devoe v. Rebant</u>, No. 05-71863, 2006 WL 334297, at *6–7 (E.D. Mich. Feb. 13, 2006) (unpublished) (holding that a police officer's use of a single drive stun from his taser to a handcuffed suspect's back after the subject refused eleven times to get into the police car did not constitute excessive force). Unlike the cited cases, Moore was <u>unsecured</u> while actively resisting. Thus, Edwards's use of force was objectively reasonable.

Alternatively, the takedown maneuver and application of force to arrest Moore did not violate clearly established law. Various circuit courts have held that an officer's use of a takedown maneuver when faced with only mild resistance does not violate clearly established law. <u>See</u>, <u>e.g.</u>, <u>Kelsay v. Ernst</u>, 933 F.3d 975, 980, 982 (8th Cir. 2019) (en banc) (holding the officer had qualified immunity for a bear-hug takedown when an angry suspect walked away from the officer for a second time); <u>Shafer v. Santa Barbara</u>, 868 F.3d 1110, 1113, 1118 (9th Cir. 2017) (holding the officer had qualified immunity for a leg sweep when the intoxicated suspect pulled away); <u>Hedgpeth v. Rahim</u>, 893 F.3d 802, 805 (D.C. Cir. 2018) (holding the officer had qualified immunity for an arm takedown accompanied by a knee to the suspect's leg because the suspect pulled his hands away while being handcuffed). Even viewing the use of force and context in the light most favorable to Moore, Edwards use of force on an unsecured and actively resisting Moore did not violate Moore's clearly established Fourth Amendment rights.

Plaintiffs also argue that the force Edwards used to get Moore into the courthouse constituted excessive force. Moore was seated on the steps in handcuffs waiting to be taken inside.

Without warning, Edwards grabbed Moore by her jacket to get her off the steps. See MBWC 00:05:22–00:05:24, 00:05:26–00:05:28. Moore turned away from Edwards to talk to Defendant White, who had just arrived on scene. Edwards then put his hand on Moore's neck and pushed her into the lobby. See id. at 00:05:26–00:05:28; WBWC 00:00:01–00:00:03. The video evidence shows this was not a chokehold, but rather a one-second push. See WBWC 00:00:01–00:00:02. Moore was not injured. Considering the absence of an injury and Moore's continued noncompliance, it was reasonable for Edwards to grab Moore and force her to stand without first giving verbal directions. Edwards had no reason to believe that Moore would comply with any orders. Furthermore, White's body worn camera shows Moore turned away from Edwards while he was trying to pull her inside. Only then did Edwards apply his hand to Moore's neck and push her inside. As discussed, various courts have held that applying far more extensive force was not considered "excessive" when a handcuffed suspect resisted. See, e.g., Craig, 49 F.4th at 411–12; Mason, 754 F. App'x at 562; Devoe, 2006 WL 334297, at *6–7.

In opposition, Moore argues that it was clearly established on March 2, 2022, that a police officer uses excessive force under the Fourth Amendment if the officer grabs a handcuffed, compliant arrestee by the neck. See [D.E. 85] 15. The video evidence in this case, however, shows that Moore was not "compliant." Moreover, the cases Moore cites are distinguishable. First, in Dunston v. Harrison, the court held that based on Fourth Circuit precedent, a reasonable police officer "would have been on notice that grabbing a restrained detainee by the neck, picking him off the ground[,] and slamming him into the ground constituted excessive force." No. 5:11-CV-747, 2014 WL 126047, at *10 (E.D.N.C. Jan. 13, 2014) (unpublished), aff'd, 585 F. App'x 190 (4th Cir. 2014) (per curiam) (unpublished). Unlike the officer in Dunston, Edwards did not pick Moore up by her neck or slam her on the ground. Second, in Young v. Prince George's County,

57

355 F.3d at 753–54, the Fourth Circuit held there was a genuine issue of material fact about whether an officer used excessive force on a handcuffed individual when the officer grabbed him by his neck from behind, put him in a headlock, forcefully threw him face-first into the ground, and then placed his knee on the center of the individual's back. See id. The officer in Young then proceeded to search the individual and strike him in the back of the head with his elbow and repeatedly beat his knee into the individual's back. See id. The factual differences speak for themselves. Considering the evidence in the light most favorable to Moore, the force that Edwards used was not excessive. Moreover, even if it was, the right at issue was not clearly established on March 2, 2022. Thus, Edwards has qualified immunity on all Moore's excessive force claims.

2.

Mizelle and Edwards also move for summary judgment on Thomas's section 1983 excessive force claims. Thomas's briefing adds instances of force that do not exist and asserts claims against Edwards that he should have asserted against Mizelle. See [D.E. 97] 13–14. Thus, the court addresses the following instances of force: (1) extracting Thomas from the vehicle (Edwards); (2) leg sweeping Thomas during the search (Edwards); (3) dragging Thomas through the parking lot (Edwards); (4) forcing Thomas down on the ground when he was trying to stand up (Mizelle); (5) putting Thomas in the prone position (Mizelle); (6) pushing Thomas down the stairs (Edwards); (7) dragging Thomas into the building and on and off the elevator (Edwards); and (8) leg sweeping Thomas in the jail lobby (Edwards).

Thomas asserts two additional claims that the court rejects because the video evidence shows that no such force was used on Thomas. First, Thomas claims Edwards laid on top of him while he was face down. See id. After reviewing both Edwards's and Mizelle's body camera footage, the court concludes that Edwards never laid on top of Thomas. Second, Thomas asserts

58

that Mizelle and Edwards dragged him to the front of the courthouse. The video evidence belies Thomas's claim. Rather, Mizelle and Edwards each supported one of Thomas's arms and carried him to the front of the courthouse steps. See MBWC 00:04:47–00:04:58; MEC 00:32:31–00:32:37. Thus, the court rejects these alleged uses of force.

First, Thomas asserts that physically removing him from the patrol car in front of WCC and pushing him against the patrol car constituted excessive force. When Edwards asked Thomas to exit the vehicle, Thomas refused and stated, "Don't grab me . . . tell me where I'm going." See DESMF ¶ 56; PSMFE ¶ 56. Edwards attempted to talk Thomas out of the vehicle for 50 seconds. When that did not work, Edwards grasped Thomas's wrists, pulled him out of the car, and stood him against the car's side panel. Thomas does not claim that this maneuver injured him, and he was actively refusing to leave the vehicle when Edwards applied this force. Furthermore, Thomas's own expert, Mike Pearl ("Pearl"), opined that Edwards was "well within his purview" to remove Thomas from the vehicle and place him against the rear pillar. See [D.E. 75-6] 47. Although Pearl questions the force Edwards used to push Thomas up against the vehicle, see id., it was a simple push that caused no harm. The Supreme Court has made clear that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (cleaned up). Based on Thomas's resistance, the minimal force used, and the absence of injury, Edwards used objectively reasonable force to remove Thomas from the vehicle.

Second, Thomas claims that Edwards's leg sweep constituted excessive force under the Fourth Amendment because Thomas was handcuffed and not resisting. In fact, however, Thomas was resisting Edwards's search. Thomas stated that he was "squeezing his leg towards the car" in an attempt to prevent Edwards from confiscating his phone and money. See DESMF ¶ 76. After

59

Thomas squeezed his leg to the car, Edwards testified that he believed Thomas was positioning himself to either physically resist or assault Edwards. See id. at ¶ 77; [D.E. 70-18] ¶ 59. Edwards then performed a leg sweep that quickly put Thomas on the ground. Combs, Edwards's law enforcement expert, opined that the technique Edwards used to take Thomas to the ground was consistent with the training provided to officers in North Carolina. See [D.E. 70-15] 37. Moreover, Thomas does not claim that any injuries resulted from this use of force. Even if Thomas tried to assert that he was not going to assault Edwards, the Supreme Court has made clear that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier v. Katz, 533 U.S. 194, 205 (2001). Based on Thomas's continued noncompliance and active resistance to Edwards's search, it was objectively reasonable to think that Thomas may resist again or try to assault Edwards. See id. Thus, Edwards's use of the leg sweep does not constitute excessive force.

Additionally, in the alternative, a reasonable officer on March 2, 2022, would not have known that a leg sweep in the face of resistance violated Thomas's clearly established rights. See Brewington v. Reynolds, No. CV 0:19-2903-DCN-PJG, 2022 WL 21747979, at *1, 5–6 (D.S.C. Jan. 25, 2022) (unpublished) (holding that it was not clearly established under Supreme Court or Fourth Circuit precedent that a leg sweep maneuver on a handcuffed detainee who pulled away from the officer was clearly established as excessive force when the maneuver fractured the detainee's C-6 and C-7 vertebrae), report and recommendation adopted, No. 0:21-CV-2903 DCN, 2022 WL 21747978 (D.S.C. Feb. 11, 2022) (unpublished). As discussed, various circuits have held that a takedown maneuver in the face of mild resistance is objectively reasonable. See Kelsay, 933 F.3d 975; Shafer, 868 F.3d 1110; Hedgpeth, 893 F.3d 802. Moreover, Thomas cites no

relevant precedent showing that the right was clearly established on March 2, 2022. Rather, Thomas argues that it has been clearly established for years that an individual has the right to be free from "unnecessary, gratuitous, or disproportionate force" against a nonviolent misdemeanant who poses no threat to safety. See [D.E. 97] 17. But the court rejects the framing of this right at such a high level of generality. See, e.g., Kisela, 584 U.S. at 104. Thus, viewing the evidence in the light most favorable to Thomas, Edwards's first leg sweep did not constitute excessive force, and Edwards is entitled to qualified immunity for that conduct.

Third, Thomas argues that Edwards dragging him in the parking lot constituted excessive force. After the leg sweep, Thomas conceded that he "aggressively resisted" against Mizelle while yelling "get off me like that." See DESMF ¶ 90; PSMFE ¶ 90. Mizelle and Edwards were trying to transport Thomas to the courthouse. Edwards tried to stand Thomas up, but Thomas kept his legs extended out in front of him. See MBWC 00:03:02–00:03:05. Moore and Gilliam were beside the officers yelling and refused commands to stay back. In addition, Goddard approached the scene too, making the officers outnumbered. See id. at 00:03:15. Edwards tried once again to stand Thomas up, but Thomas kept his feet outstretched and fell to the ground. See id. at 00:03:22–00:03:24. Thomas contends that his legs were not working at the time but given Thomas's continued noncompliance and conceded resistance, it was reasonable for the officers to believe he was passively resisting.[4] Edwards then grabbed Thomas and dragged him for three seconds towards the courthouse building. See id. at 00:03:24–00:03:27. Thomas alleges no injuries from the drag. Even assuming that Thomas was not passively resisting, Fourth Circuit precedent demonstrates that the drag did not constitute excessive force under the Fourth Amendment. See

---

[4] Notably, four seconds after Thomas claimed his legs were unable to move, he jumped up into a squat position to stand up after Moore was struck in the face. See id. at 00:03:28–00:03:32.

61

Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002). In Brown, the Fourth Circuit held that dragging a handcuffed woman to a patrol car did not constitute excessive force because the scene was tense and the woman was noncompliant. See id. Additionally, the drag caused no injury. See id. As in Brown, Thomas was noncompliant, and Edwards dragged Thomas a short distance, causing no injury. Moreover, Edwards was attempting to get himself and Thomas away from the tense scene created by the three approaching individuals: Gilliam, Moore, and Goddard. See id.; see also Hicks v. City of Portland, No. CV 04-825-AS, 2006 WL 3311552, at *10 (D. Or. Nov. 8, 2006) (unpublished) (holding that the officer's drag of the suspect did not constitute excessive force because he "had a substantial interest in extricating [the suspect] from the crowd as quickly as possible in light of [the suspect's] passive resist[a]nce and the aggressive behavior of other protesters in the park"). Thus, viewing the evidence in the light most favorable to Thomas, the parking lot drag did not constitute excessive force.

Thomas argues that it was clearly established on March 2, 2022, that an officer cannot transport a handcuffed individual by dragging them. In support, Thomas cites four distinguishable cases. First, in Witt v. West Virginia State Police, Troop 2, 633 F.3d 272 (4th Cir. 2011), the officers handcuffed a compliant suspect, dragged him across a yard, and then threw him against a tree. See id. at 274. The officers' actions resulted in a "left orbital fracture, a facial laceration of 2.5 centimeters, a scalp laceration of 2.5 centimeters, a second scalp laceration of 3 centimeters, and a closed head injury." Id. Second, in Summers v. West Virginia Department of Homeland Security, No. 2:22-CV-148, 2023 WL 8858559 (S.D.W. Va. Dec. 21, 2023) (unpublished), the officers dragged a woman across concrete and gravel which resulted in the amputation of the woman's leg. See id. at *1. Third, in Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341 (1st Cir. 1995), the officers grabbed a compliant suspect, pulled her body from the

booth and across a table, handcuffed her, and dragged her from the booth while she begged to walk on her own. See id. at 346. Lastly, in Fundiller v. City of Cooper City, 777 F.2d 1436 (11th Cir. 1985), the officer fired his weapon at the suspect, striking him five times, before another group of officers dragged the suspect from the car, handcuffed him, and left him face down on the ground in hopes that he would bleed to death. See id. at 1438, 1441. These cases do not demonstrate that it was a clearly established violation of the Fourth Amendment on March 2, 2022, to drag a noncompliant suspect a short distance in the midst of a chaotic and tense scene.

Fourth, Thomas asserts that Mizelle used excessive force when Mizelle pushed him onto the ground as he tried to stand up. While Thomas was being dragged, Moore approached Edwards and Edwards abandoned his hold on Thomas to stop Moore. Edwards then left Thomas on the ground, hit Moore, and followed Moore when she retreated. After witnessing the strike, Thomas squatted in an attempt to stand up while yelling at Edwards. See MBWC 00:03:28–00:03:32. Meanwhile, as Thomas was attempting to stand, Gilliam was yelling and pushing Mizelle. See id. at 00:03:29–00:03:32. As Gilliam stood yelling in Mizelle's face, Mizelle pushed Thomas back down to the ground and onto his right side. Thomas was in a squatting position, and the push took him only inches back to the ground. Mizelle needed to regain control, and Gilliam and Thomas outnumbered him. Moreover, mere moments before this event, Thomas had "aggressively resisted" against Mizelle. See DESMF ¶ 90; PSMFE ¶ 90. As such, Mizelle had to make a "split-second judgment" in a situation that had become "tense" and "uncertain" to apply force. Graham, 490 U.S. at 396. Thus, it was objectively reasonable for Mizelle to apply force in an attempt to regain control over an escalating and chaotic scene. See id.; Johnson v. Rogers, 944 F.3d 966, 967, 970 (7th Cir. 2019) (holding that no excessive force was used when an officer first pushed an arrestee back onto the ground to regain control and then used a kick to make him sit, which

fractured the arrestee's leg); Brown, 278 F.3d at 369 (holding that the officer was justified in dragging the handcuffed suspect to the patrol car in the face of a chaotic and escalating scene); Vandyke v. Hall, 743 F. Supp. 2d 561, 567 (W.D. Va. 2010) (holding that an officer did not use excessive force when he deployed pepper spray on an arrestee and his mother to regain control over the situation as they screamed at the officer).

Fifth, Thomas argues that Mizelle used excessive force when he held Thomas in the prone position with his arms handcuffed behind his back for 20 seconds. After Mizelle pushed Thomas down, Thomas laid on his right side while Mizelle held him in place. Thomas then witnessed Edwards conduct a takedown maneuver on Moore to arrest her. Thomas started screaming expletives at Edwards, and Mizelle told Thomas to "calm down." See MBWC 00:04:11–00:04:13. Thomas then yelled at Mizelle to "get the f—ck off" multiple times. See id. at 00:04:15–00:04:17. Thomas continued to yell at Mizelle and started turning himself in a circle on the ground. See id. at 00:04:17–00:04:29. Although Thomas contends that he was subdued and not resisting, the video evidence shows the opposite. See PSMFBM ¶ 131. At that point, Mizelle flipped Thomas to the prone position. See MBWC 00:04:28–00:04:29. While doing so, Mizelle told Thomas to "stop fighting" and "stop resisting." Thomas was in the prone position for only 20 seconds before Edwards returned from arresting Moore and helped Mizelle transport Thomas to the courthouse steps. See id. at 00:04:28–00:04:47. Being placed in the prone position alone does not constitute excessive force. See Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 593–94 (7th Cir. 1997); Lawhon v. Edwards, 477 F. Supp. 3d 428, 446 (E.D. Va. 2020), aff'd sub nom., Lawhon v. Mayes, No. 20-1906, 2021 WL 5294931 (4th Cir. Nov. 15, 2021) (per curiam) (unpublished).

To determine whether it was reasonable to use the prone position, the court considers the full context. When Mizelle flipped Thomas into the prone position, Thomas and his family

64

members posed a threat to the officers. Thomas and his family members refused commands, outnumbered the officers, and were yelling expletives. Moreover, Thomas actively resisted against Mizelle even when Mizelle told Thomas to calm down and stop resisting. When Thomas failed to comply with these verbal commands, Mizelle put Thomas in the prone position for 20 seconds. Thomas does not contend that this 20 second hold injured him. Viewing the evidence in the light most favorable to Thomas while also accounting for the undisputed video evidence, it was objectively reasonable to place Thomas in the prone position.

Thomas argues that on March 2, 2022, it was a clearly established Fourth Amendment violation to place a handcuffed individual in the prone position, even if the individual actively resisted. In support, Thomas cites Lawhon, 477 F. Supp. 3d 428. Lawhon is distinguishable. In Lawhon, the court denied an officer's motion to dismiss when the officer placed an injured person in the prone position while he was face down in a pillow for six minutes. See id. at 434–35, 445–48. Moreover, the individual in Lawhon allegedly died from asphyxiation due to the long-term prone position hold. See id. at 435. The Fourth Circuit affirmed the district court's decision and held that, at the time of the incident, it was clearly established that officers could not use that kind of force on an incapacitated suspect that was no longer responsive. Lawhon, 2021 WL 5294931, at *2. Unlike the individual in Lawhon, Thomas was not incapacitated. Rather, he was actively resisting against Mizelle. Furthermore, he was only on his stomach for 20 seconds and experienced no injuries.

Thomas also cites Myers v. City of Charleston, No. 2:19-CV-757, 2021 WL 925326, at *12 (S.D.W. Va. Mar. 10, 2021) (unpublished). In Myers, the court collected circuit cases that held that "handcuffing a subject and forcibly keeping him in a prone position, absent further resistance, constitutes excessive force." Id. at *12 (emphasis added). Unlike in the cases collected

65

in <u>Myers</u>, Thomas was actively resisting against Mizelle, who flipped Thomas into the prone position only to regain control until Edwards arrived as backup. Thus, Mizelle is entitled to qualified immunity on this use of force.

Sixth, Thomas argues that Edwards pushing him down the courthouse steps constituted excessive force. Viewing the evidence in the light most favorable to Thomas, the court finds that Edwards is not entitled to qualified immunity for this use of force. After Mizelle and Edwards walked Thomas to the top of the courthouse steps, Mizelle turned back toward the parking lot. <u>See</u> MEC 00:32:35–00:32:39. At the top of the steps, Edwards had his right arm under Thomas's left arm, and his hand on the back of Thomas's neck. <u>See</u> <u>id.</u> at 00:32:37; DBMSMF ¶ 138; PSMFBM ¶ 138. Thomas pulled backwards, trying to avoid going down the stairs. <u>See</u> MEC 00:32:37–00:32:39.

Viewing the evidence in the light most favorable to Thomas, Edwards drove his knee into Thomas's back, pushing Thomas down the stairs and into the brick wall. <u>See</u> DESMF ¶ 135; PSMFE ¶ 135. Thomas was injured by this fall. The Fourth Circuit has held that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." <u>Meyers v. Baltimore Cnty.</u>, 713 F.3d 723, 734 (4th Cir. 2013); <u>Bailey v. Kennedy</u>, 349 F.3d 731, 744–45 (4th Cir. 2003); <u>Jones</u>, 325 F.3d at 531–32. Moreover, viewing the evidence in the light most favorable to Thomas, Edwards pushed Thomas down the stairs when he was secured in handcuffs and unable to brace his fall into the brick wall. Although Thomas pulled back to avoid walking down the stairs, pushing Thomas, an unarmed misdemeanant, down the steps headfirst into a brick wall is disproportionate and unnecessary. <u>See</u> <u>Valdez v. United States</u>, 58 F. Supp. 3d 795, 821 (W.D. Mich. 2014) (holding that an officer pushing the suspect down the stairs and into a railing was a

paradigm case of "gratuitous force"); Adedeji v. Hoder, 935 F. Supp. 2d 557, 569 (E.D.N.Y. 2013) (upholding a jury verdict for excessive force and upholding a denial of qualified immunity when an officer pushed a handcuffed misdemeanant arrestee at the top of the stairs because he had stopped walking, causing him to fall down the stairs).

The court also finds that the right to be free from disproportionate and unnecessary force was clearly established before the incident on March 2, 2022. Simply because the Supreme Court and the Fourth Circuit do not have a case squarely on point does not end the inquiry. See, e.g., Hope v. Pelzer, 536 U.S. 730, 739 (2002) (rejecting the proposition that qualified immunity is inapplicable only if the very action in question has previously been held unlawful); Robles v. Prince George's Cnty., 302 F.3d 262, 270 (4th Cir. 2002) (same); see Buonocore v. Harris, 65 F.3d 347, 356–57 (4th Cir. 1995); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992). Thus, the absence of a judicial decision on March 2, 2022, from the Supreme Court, the Fourth Circuit, or the Supreme Court of North Carolina holding that it is unlawful to push a handcuffed misdemeanant down a set of stairs into a brick wall does not control the analysis. The Supreme Court has recognized that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741. Moreover, the Fourth Circuit has also held for over 20 years that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." Meyers, 713 F.3d at 734; Bailey, 349 F.3d at 744–45; Jones, 325 F.3d at 531–32.

Viewing the evidence in the light most favorable to Thomas, Thomas was unarmed and effectively secured in handcuffs. A reasonable officer in Edwards's position would have understood that pushing Thomas headfirst into the brick wall violated Thomas's Fourth

Amendment right to be free from the use of excessive and unreasonable force. Thus, Edwards is not entitled to summary judgment for this use of force.

Seventh, Thomas argues that Edwards dragging him into the courthouse and on and off the elevator constituted excessive force. The court disagrees. After Thomas hit the brick wall, Edwards faced a tense and escalating scene once again. As Gilliam and Goddard screamed and approached Edwards, Edwards dragged Thomas into the courthouse and placed him on his back. See MBWC 00:05:15–00:05:25. Edwards then grabbed Moore. Once Moore and Edwards were inside the courthouse, Phelps and White, who had just arrived, held the door open. Gilliam and Goddard continued to yell and scream. See id. at 00:05:25–00:05:50. After Thomas opened his eyes, Edwards grabbed Thomas by his shoulder, supported his neck, and dragged him several feet into the elevator. Gilliam then pushed her way into the building. Unsurprisingly, Edwards felt he needed to get Thomas and Moore upstairs to diffuse the situation as quickly as possible, justifying the drag inside the courthouse and onto the elevator. See DESMF ¶ 155; Graham, 490 U.S. at 396; Brown, 278 F.3d at 369; see also Hicks, 2006 WL 3311552, at *10. Once inside the elevator, Thomas kept extending his leg in front of the elevator door. Whether Thomas's conduct in doing so was intentional or not is irrelevant. To prevent Thomas's leg from holding the elevator door open, Edwards kneeled on Thomas's leg, so that the officers could get Moore and Thomas upstairs.

During the elevator ride, Phelps tried to help Thomas stand but Thomas told him he could not and then stopped speaking to Phelps. After several minutes, Edwards grabbed Thomas's left pant leg and belt and dragged him out of the elevator and onto the jail lobby floor. See PBWC 00:04:52–00:05:02. At that point, Edwards would have no reason to think that Thomas would comply with an order to stand. See Hill v. Wonch, No. 2:19-CV-159, 2021 WL 911960, at *4 (W.D. Mich. Mar. 10, 2021) (unpublished) (dragging plaintiff was reasonable where the plaintiff

68

"may have simply refused to [walk] as a passive means of resisting" and the body camera did not show him being dragged roughly). Moreover, the video shows that Thomas had refused nearly every command throughout the evening. Additionally, those actions did not injure Thomas and Edwards dragged him only a few feet on a smooth, tiled surface while Thomas was fully clothed. Furthermore, the cases Thomas cites to support a claim for excessive force for dragging are not representative of the facts, force, or injuries in this case. Cf. Witt, 633 F.3d at 274; Summers, 2023 WL 8858559, at *1; Alexis, 67 F.3d at 346; Fundiller, 777 F.2d at 1438, 1441.

Next, Thomas argues that the jail leg sweep also constituted excessive force. Once Moore and Thomas were in the jail lobby, the video shows Moore and Thomas loudly yelling about Edwards's conduct. See PBWC 00:06:00–00:07:00. After a couple minutes, Thomas stood up while addressing Phelps. See id. at 00:07:10–00:07:12. Edwards grabbed the back of Thomas's sweatshirt. Thomas moved away, telling Edwards to "get off" him because he "ain't did shit." See id. at 00:07:12–00:07:15. Edwards responded "yes you have." See id. Edwards did not direct Thomas to sit down. See id. at 00:07:12–00:07:18. Rather, Edwards pushed on Thomas's right shoulder, kicked Thomas's right leg out from underneath him, and brought him to the ground. See PBWC 00:07:14–00:07:19; MBWC 00:12:37–00:12:44. The leg sweep did not injure Thomas. Moreover, Edwards testified that he believed it was safer for Thomas to remain seated given the agitated environment. See DESMF ¶ 184. Although Edwards did not tell Thomas to sit down, he grabbed his sweatshirt as soon as he rose, giving a nonverbal cue to sit. Furthermore, Edwards had no reason to believe that Thomas would obey a verbal command. After all, Thomas resisted, pulled away, and told Edwards to get off of him.

Thomas argues that the leg sweep constituted excessive force. See [D.E. 85] 19–20. In support, Thomas cites Johnson v. City of Fayetteville, 91 F. Supp. 3d 775 (E.D.N.C. 2015). In

Johnson, the court denied summary judgment for an officer after he used a leg sweep and then threw an individual into a patrol car who was not threatening anyone, not actively resisting, and not attempting to flee. See id. at 804. Unlike Johnson, however, Edwards did not use subsequent force after the successful takedown maneuver and Thomas was resisting Edwards's attempts to grab him. Furthermore, as discussed, courts have overwhelmingly agreed that a leg sweep is appropriate in the face of mild resistance and noncompliance, speaking to both the objective reasonableness of the takedown and the lack of clearly established precedent. See, e.g., Brewington, 2022 WL 21747979, at *1, 5–6; Kelsay, 933 F.3d 975; Hedgpeth, 893 F.3d 802; Shafer, 868 F.3d 1110. Thus, even viewing the evidence in the light most favorable to Thomas, Edwards's leg sweep in the face of Thomas's continued noncompliance and resistance was objectively reasonable.

In sum, Mizelle has qualified immunity. Thus, he is entitled to summary judgment on Thomas's section 1983 claim for excessive force (count one). Moreover, Edwards has qualified immunity and is entitled to summary judgment on Moore's section 1983 claim for excessive force (count two). Edwards is not entitled to summary judgment, however, for a portion of Thomas's section 1983 claim for excessive force at the stairs (count one). Particularly, a genuine issue of material fact exists regarding whether the force Edwards used at the stairs was objectively reasonable.

C.

Next, the court addresses Moore's and Thomas's section 1983 failure to intervene claims against Mizelle in count four and Barnes and Mizelle in count six. "[A]n officer may be liable under [Section] 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm;

70

and (3) chooses not to act." Randall v. Prince George's Cnty., 302 F.3d 188, 204 (4th Cir. 2002) (footnote omitted); see Thompson v. Commonwealth of Va., 878 F.3d 89, 107 n.5 (4th Cir. 2017); Stevenson v. City of Seat Pleasant, Md., 743 F.3d 411, 417 (4th Cir. 2014); Whitten v. Gunter, 757 F. App'x 235, 236–37 (4th Cir. 2018) (per curiam) (unpublished). "Notably, the level of specific knowledge [required] of a bystander is high." Myers v. Taylor, No. 1:14-CV-156, 2015 WL 8056128, at *8 (N.D.W. Va. Dec. 4, 2015) (unpublished).

Mizelle, Phelps, and White did not witness the only remaining instance of alleged excessive force: Edwards's use of force at the stairs. Mizelle faced the parking lot during the fall. See MEC 00:32:37–00:32:41. And Phelps and White arrived in their vehicle approximately ten seconds after the fall. See id. at 00:32:50. Thus, the officers did not know that Edwards allegedly was violating Thomas's constitutional rights and could not have prevented the harm. See Randall, 302 F.3d at 204. Accordingly, the court grants summary judgment on count four against Mizelle and count six against Phelps and White. Additionally, the court grants summary judgment on the corresponding Monell claims that allege a failure to train on the duty to intervene against Barnes (count five) and Wiliams and Plymouth (count seven). See, e.g., Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978)

D.

Barnes, in his official capacity, moves for summary judgment on the three section 1983 Monell claims brought against him for failure to train, failure to supervise and discipline, and failure to screen. To state a claim under section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); see Philips, 572 F.3d at 180; N. Carolina All. for Retired Ams. v. Hirsch, 741 F.

71

Supp. 3d 318, 334 (E.D.N.C. 2024). A section 1983 plaintiff must also plausibly allege the

personal involvement of a defendant. See, e.g., Iqbal, 556 U.S. at 676–77; Monell, 436 U.S. at

691–94; Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); Hirsch, 741 F. Supp. 3d at 334.

When a municipal entity is sued—directly or in an official-capacity suit—the plaintiff must

plausibly allege that a "policy or custom" attributable to the municipal entity caused the violation

of the plaintiff's federally protected rights. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397,

403–05 (1997); Hafer v. Melo, 502 U.S. 21, 25 (1991); Kentucky v. Graham, 473 U.S. 159, 166

(1985); Monell, 436 U.S. at 690–94; King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Owens

v. Balt. City State's Att'ys Off., 767 F.3d 379, 402 (4th Cir. 2014); Santos v. Frederick Cnty. Bd.

of Comm'rs, 725 F.3d 451, 469–70 (4th Cir. 2013); Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir.

2003); Carter v. Morris, 164 F.3d 215, 218–19 (4th Cir. 1999). "Monell's 'policy or custom'

requirement applies in [section] 1983 cases irrespective of whether the relief sought is monetary

or prospective." Los Angeles Cnty. v. Humphries, 562 U.S. 29, 39 (2010). There are four ways

in which liability for a policy or custom may arise:

> (1) through an express policy, such as a written ordinance or regulation; (2) through
> the decisions of a person with final policymaking authority; (3) through an
> omission, such as a failure to properly train officers, that manifests deliberate
> indifference to the rights of citizens; or (4) through a practice that is so persistent
> and widespread as to constitute a custom or usage with the force of law.

Lytle, 326 F.3d at 471 (cleaned up).

A violation results from a municipal entity's policy or custom if the violation resulted from

"a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that

body's officers." Monell, 436 U.S. at 690; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121–

23 (1988). Even if a section 1983 plaintiff can identify the requisite final policymaking authority

under state law, a municipality is not liable simply because a section 1983 plaintiff can "identify

conduct attributable to the municipality." Riddick v. Sch. Bd. of Portsmouth, 238 F.3d 518, 524 (4th Cir. 2000). Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." Brown, 520 U.S. at 404 (cleaned up); see City of Canton v. Harris, 489 U.S. 378, 389–90 (1989); Riddick, 238 F.3d at 524. Thus, to avoid imposing respondeat superior liability on municipalities, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411; see Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218–19.

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) abrogated on other grounds by Short v. Hartman, 87 F.4th 593 (4th Cir. 2023), cert. denied, 144 S. Ct. 2631 (2024). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, a section 1983 plaintiff also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404.

Plaintiffs sued Barnes in his official capacity, which effectively sued WCSO. Plaintiffs allege three Monell violations against WCSO. First, Barnes failed to train Edwards on excessive force (count three[5] and count eight). Second, Barnes failed to supervise and discipline Edwards (count nine). Third, WCSO's customs for screening and hiring new personnel are deficient (count ten).

_____

[5] Count three alleges a section 1983 excessive force claim against Barnes and then seeks to morph it into a Monell claim. See [D.E. 1] ¶¶ 297–308. Because count three duplicates the issues addressed in the three Monell claims, it rises and falls with those claims.

73

Plaintiffs assert a <u>Monell</u> claim against WCSO for the failure to train. Training policy deficiencies can include (1) "express authorizations of specific unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, and (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty." <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1390 (4th Cir. 1987). No matter the theory alleged, a plaintiff must identify "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training." <u>Id.</u>; <u>see also</u> <u>McDowell v. Grimes</u>, No. CV GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018) (unpublished). Here, plaintiffs fail to prove a specific deficiency. Notably, the WCSO handbook contains specific policies regarding use of force, arrest procedures, and force in the face of resistance. <u>See</u> DBMSMF ¶¶ 6–7(B); PSMFBM ¶¶ 6–7(B). Plaintiffs do not contend that any of these policies authorized unconstitutional conduct. Rather, plaintiffs claim that the required understanding of these policies was ineffective, which is not enough. <u>See</u> <u>Spell</u>, 824 F.2d at 1390. Furthermore, WCSO has required trainings and informal trainings for its officers. New hires are taken on ride-alongs with more senior officers to receive informal training and guidance. <u>See</u> DBMSMF ¶ 23; PSMFBM ¶ 23. And officers must take in-service training annually, including lesson plans on various topics selected by the North Carolina Sheriff's Education and Training Standards Commission. <u>See</u> DBMSMF ¶ 24; PSMFBM ¶ 24. Although plaintiffs opine that the training is lax and ineffective, that opinion does not suffice to create a genuine issue of material fact. <u>See, e.g.</u>, <u>Spell</u>, 824 F.2d at 1390. Additionally, plaintiffs note that many of the new hires, like Mizelle, did not have Basic Law Enforcement Training ("BLET") and did not receive additional trainings to bridge that gap in their knowledge. But that deficiency cannot support this claim (which focuses on Edwards) because Edwards received BLET training before joining WCSO. <u>Compare</u> DBMSMF ¶ 28, <u>with</u> PSMFBM ¶ 28. No "direct causal link" exists between

the alleged municipal inaction and the alleged constitutional violation here. See Brown, 520 U.S. at 410. Thus, the court grants summary judgment to Barnes on this claim.

Next, plaintiffs allege a failure to investigate and discipline incidents of force. The court assumes without deciding that a failure to investigate and discipline incidents of force can amount to an actionable policy under section 1983 if "deliberate indifference" can be shown. See McKnight v. District of Columbia, 412 F. Supp. 2d 127, 133 (D.D.C. 2006). Here, there was no failure to investigate and discipline instances of force. WCSO allows individuals who have been subjected to police force to file a notarized complaint with WCSO. Compare DBMSMF ¶¶ 32–33, with PSMFBM ¶¶ 32-33. Once submitted, WCSO investigates the complaints. Plaintiffs complain that only the individual subjected to the force can submit a complaint. Compare DBMSMF ¶¶ 32–33, with PSMFBM ¶¶ 32-33. But for WCSO to maintain an efficient process, the system must be streamlined. Barnes testified that WCSO investigated the complaints about Edwards, and he was either exonerated or there was insufficient evidence that he violated any policies. Compare DBMSMF ¶¶ 32–33, with PSMFBM ¶¶ 32-33. To demonstrate a deficiency, plaintiffs cite Shaw v. Stroud, 13 F.3d 791, 800 (4th Cir. 1994). In Shaw, the officer using excessive force was never investigated or counseled. See id. Here, WCSO investigated each instance of force, and Chief Deputy Norman counseled Edwards about how he conducted traffic stops. See [D.E. 93] 30. Compare DBMSMF ¶¶ 32–33, with PSMFBM ¶¶ 32-33.

Even viewing the record in the light most favorable to plaintiffs, no deficiency in supervision and discipline exists. Alternatively, plaintiffs make no showing of deliberate indifference. The undisputed facts show that WCSO investigated the incidents submitted according to the complaint guidelines. See Brown, 520 U.S. at 411; Harris, 489 U.S. at 392;

Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218–19. Thus, Barnes is entitled to summary judgment on this claim.

Next, plaintiffs allege a failure to screen applicants. This claim is not a claim for a "single hiring decision" that triggers a heightened standard. Brown, 520 U.S. at 407. Rather, plaintiffs contest the customs surrounding WCSO's hiring practices more generally.

Barnes delegated hiring procedures to Chief Deputy Norman who delegated hiring to the patrol lieutenant. See [D.E. 70-4] 31. WCSO does not consistently review applicant's personnel files or references, and Barnes and Norman do not necessarily know when the patrol lieutenant checks those items because they trust the patrol lieutenant to conduct those inquiries. See DBMSMF ¶ 14; PSMFBM ¶ 14; [D.E. 70-4] 35. At the WCSO, officers undergo the application and screening process, which includes a background check, a criminal history check, and a check on whether the officer has been decertified by the North Carolina Sheriffs' Education and Training Standards Commission. See DBMSMF ¶ 15; PSMFBM ¶ 15. During the hiring and screening of potential WCSO deputies, Chief Deputy Norman and Barnes discuss potential candidates before hiring them, and hiring is normally a joint decision between Barnes and Chief Deputy Norman. See DBMSMF ¶ 18; PSMFBM ¶ 18. Once Chief Deputy Norman gives his assessment of a candidate, Barnes ultimately decides whether to appoint a candidate as a WCSO deputy. See DBMSMF ¶ 18; PSMFBM ¶ 18.

The screening and hiring custom at WCSO does not constitute "deliberate indifference." Deputy Norman and Barnes delegated the initial personnel review to the patrol lieutenant. Nobody deposed the patrol lieutenant. Plaintiffs have no evidence to show that the patrol lieutenant acted with deliberate indifference or to show that putting the patrol lieutenant in charge of the screening

76

process was even negligent. See Grayson, 195 F.3d at 695. Thus, plaintiffs have failed to show there is a genuine issue of material fact, and the court grants summary judgment on this claim.

E.

Plaintiffs also assert claims against Mizelle and Edwards for battery and assault (count thirteen). Under North Carolina law, "[a]n assault is an offer to show violence to another without striking him, and a battery is the carrying of the threat into effect by the infliction of a blow." Dickens v. Puryear, 302 N.C. 437, 444, 276 S.E.2d 325, 330 (1981). "A battery is made out when the . . . plaintiff is offensively touched against his will." Ormond v. Crampton, 16 N.C. App. 88, 94, 191 S.E.2d 405, 410 (1972).

North Carolina law permits an assault and battery claim against a law enforcement officer if the plaintiff can show that the officer used excessive force under the circumstances. See Glenn-Robinson, 140 N.C. App. at 625, 538 S.E.2d at 615. At the same time, under North Carolina law, "public officials engaged in discretionary, governmental duties enjoy absolute immunity from personal liability so long as they keep within the scope of their official authority and act without malice or corruption." Bailey, 349 F.3d at 742; see also Meyer v. Walls, 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997). A public officer's official immunity, however, is unavailable to officers when they violate clearly established law "because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." Bailey, 349 F.3d at 742 (quotations omitted); see Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). Thus, in excessive force cases, a "parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so [it] goes forward as well" if the federal claim survives summary judgment. Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994).

77

The only remaining claim for excessive force is Thomas's claim against Edwards concerning the incident at the stairs. Thus, the court denies the motion for summary judgment on Thomas's state law assault and battery claim against Edwards concerning the incident at the stairs. But the court grants summary judgment to Mizelle on Thomas's and Moore's state law claims. See Glenn-Robinson, 140 N.C. App. at 625, 538 S.E.2d at 615. The court also grants summary judgment to Edwards on Moore's assault and battery claims. See id.

F.

As for Moore's request for punitive damages (count fifteen), the claim fails under North Carolina law. See N.C. Gen. Stat. § 1D-15. As for section 1983, punitive damages can only arise from conduct involving "reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987); see Smith v. Wade, 461 U.S. 30, 56 (1983). Because there is no evidence that Edwards, Mizelle, White, or Phelps acted with malicious intent to injure Moore, the court grants summary judgment to them concerning punitive damages.

As for Thomas's request for punitive damages, the court finds that the claim for punitive damages against Mizelle, White, and Phelps fails for the same reason as Moore's request. Thus, Mizelle, Thomas, and Phelps are entitled to summary judgment concerning punitive damages. But, with respect to the incident at the stairs, there is a genuine issue of material fact under both North Carolina law and section 1983 about whether Edwards acted with "willful or wanton conduct" or a "reckless or callous indifference to [a] federally protected right[]" respectively. See N.C. Gen. Stat. § 1D-15; Cooper, 814 F.2d at 948. Thus, Thomas's claim for punitive damages against Edwards survives summary judgment.

## G.

Barnes moves for summary judgment on the claim against the sheriff's surety bond (count sixteen). Under N.C. Gen. Stat. § 58-76-5, "[e]very person injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff . . . may institute a suit or suits against said officer or any of them and their sureties[;]" upon doing so, "every such officer and the sureties on the officer's official bond shall be liable to the person injured for all acts done by said officer by virtue or under color of that officer's office." A surety, however, is a necessary party to proceedings against the sheriff and sheriff's deputies in their official capacities. See N.C. Gen. Stat. § 58-76-5; State ex rel. Cain v. Corbett, 235 N.C. 33, 39, 69 S.E.2d 20, 24 (1952); see also Summey v. Barker, 142 N.C. App. 688, 691, 544 S.E.2d 262, 265 (2001).

Plaintiffs failed to name the sheriff's surety as a party in this case. In fact, it is unclear whether plaintiffs even know who the sheriff's surety is, writing "XYZ surety" in the complaint. See [D.E. 1] 77. Plaintiffs have not filed a motion to amend their complaint to add the sheriff's surety as a necessary party, and "parties cannot amend their complaint through briefing." See, e.g., United States ex rel. Carter v. Halliburton Co., 866 F.3d 199, 210 n.6 (4th Cir. 2017); Murray Energy Corp. v. Adm'r of EPA, 861 F.3d 529, 537 n.5 (4th Cir. 2017); vonRosenberg v. Lawrence, 849 F.3d 163, 167 n.1 (4th Cir. 2017); S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184–85 (4th Cir. 2013); see also Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009); Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009); United States ex rel. Graybar Elec. Co., Inc. v. TEAM Constr., LLC, 275 F. Supp. 3d 737, 748 n.3 (E.D.N.C. 2017); Shinaberry, 2019 WL 5446712, at *5 n.4. Thus, the court grants summary judgment on this claim.

IV.

In sum, the court GRANTS plaintiffs' motion in limine to exclude Albert Vangura's report and testimony [D.E. 80]. The court GRANTS Defendants Plymouth's, Williams's, Phelps's, and White's motion for summary judgment [D.E. 64]. The court GRANTS Defendants Barnes's and Mizelle's motion for summary judgment [D.E. 69]. The court GRANTS in part and DENIES in part Defendant Edwards's motion for summary judgment [D.E. 72]. The court DENIES plaintiffs' motion for leave to file a surreply [D.E. 119].

The remaining parties SHALL engage in a court-hosted mediation with United States Magistrate Judge Numbers. If the case does not settle, the parties SHALL meet and confer and propose trial dates in 2026.

SO ORDERED. This 30 day of September, 2025.

JAMES C. DEVER III
United States District Judge